UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARYAM KHANSARI, IBY DEGEORGE-GEAREY
and MARIA DAIDONE, on behalf of themselves and all
others similarly situated,

                         Plaintiffs,

            - against -

ST. BARNABAS HOSPITAL,

                  Defendant.

15-CV-1803 (PGG) (HBP)

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177
(212) 351-4500

*Attorneys for Defendant St. Barnabas Hospital*

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF FACTS .................................................................3

    A.    Plaintiffs' Employment .............................................. 3

        (i)    Plaintiffs' Duties ........................................ 3

        (ii)    Preparation of TPs........................................ 4

    B.    Plaintiffs' Retaliation Claims .......................................... 6

        (i)    Khansari Forged Patient Signatures........................... 6

        (ii)    DeGeorge Forged Patient Signatures........................... 7

        (iii)    Cassandra Jackson's Investigation............................. 8

    C.    Plaintiffs' Hostile Work Environment Claims....................... 10

        (i)    Khansari's and DeGeorge's Claims........................... 10

            (a)    Khansari's Allegations against Withim. ..................... 11

            (b)    DeGeorge's Allegations against Withim. ................... 13

            (c)    Allegations That Female Clinicians Were Treated Differently. .................................................. 13

        (ii)    Daidone's Discrimination Claims........................... 15

        (iii)    Plaintiffs' Allegations Against Other Supervisors................... 16

        (iv)    DeGeorge's Disability Discrimination and Retaliation Claims............... 16

    D.    Defendant's Wage and Hour Policies.................................. 17

    POINT I:    DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' NYCHRL RETALIATION CLAIMS........................19

    A.    Defendant Should be Granted Summary Judgment on Daidone's Retaliation Claims And DeGeorge's Retaliation Claim Based On Her Disability Because Neither Engaged In Any Protected Activity. ....................... 20

B.      Plaintiffs Were Terminated for Legitimate, Non-Retaliatory Reasons. ............... 20

**POINT II:   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON
             PLAINTIFFS' HOSTILE WORK ENVIRONMENT CLAIMS** ....................22

A.      Plaintiffs Were Not Subjected To Any Discriminatory Conduct Or Comments.. 22

B.      SBH Did Not Treat Plaintiffs Differently From Similarly Situated Employees. . 24

C.      DeGeorge's Disability Discrimination Claim Is Without Merit............................ 27

**POINT III:  PLAINTIFFS ARE EXEMPT EMPLOYEES UNDER THE NYLL.
             THEY ARE NOT ENTITLED TO OVERTIME UNDER THE NYLL** .........27

**POINT IV:  DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON
             PLAINTIFFS' OVERTIME CLAIMS.** ...............................................................29

A.      Plaintiffs Cannot Establish They Worked More Than 40 Hours
        in Any Workweek in ........................................................................................ 32

B.      Plaintiffs Cannot Establish Defendant Was Aware They Worked
        "Off The Clock".................................................................................................. 33

**POINT V:  DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON
           PLAINTIFFS' WTPA CLAIMS.** ......................................................................35

**CONCLUSION**.................................................................................................................35

FIRM:38194012

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abdu-Brisson v. Delta Air Lines, Inc.,*
  239 F.3d 456 (2d Cir. 2001)..................................................................................22

*Abdul-Hakeem v. Parkinson,*
  523 F. App'x 19 (2d Cir. 2013) ...........................................................................22

*Alfano v. Costello,*
  294 F.3d 365 (2d Cir. 2002)..................................................................................23

*Anderson v. Mt. Clemens Pottery Co.,*
  328 U.S. 680 (1946).........................................................................................30, 32

*Bir v. Pfizer, Inc.,*
  510 F. App'x 29 (2d Cir. 2013) ...........................................................................23

*Cameron v. Cmty. Aid for Retarded Children, Inc.,*
  335 F.3d 60 (2d Cir. 2003)....................................................................................24

*Campbell v. New York City Transit Auth.,*
  93 F. Supp. 3d 148, 173 (E.D.N.Y. 2015) ..........................................................23

*Carter v. Verizon,*
  2015 U.S. Dist. LEXIS 6370 (S.D.N.Y. Jan. 20, 2015)......................................24

*Chao v. Gotham Registry, Inc.,*
  514 F.3d 280 (2d Cir. 2008)............................................................................30, 35

*Daniels v. 1710 Realty LLC,*
  2011 U.S. Dist. LEXIS 91902 (E.D.N.Y. Aug. 17, 2011),
  *aff'd,* 497 F. App'x 137 (2d Cir. 2012)...............................................................31

*DiSantis v. Morgan Props. Payroll Servs.,*
  2010 U.S. Dist. LEXIS 96838 (E.D. Pa. Sept. 16, 2010) ...................................31

*EEOC v. Bloomberg L.P.,*
  967 F. Supp. 2d 816 (S.D.N.Y. 2013)..................................................................21

*El Sayed v. Hilton Hotels Corp.,*
  627 F.3d 931 (2d Cir. 2010)..................................................................................21

*Forrester v. Roth's I.G.A. Foodliner, Inc.,*
  646 F.2d 413 (9th Cir. 1981) ...........................................................................34-35

iii

*Gordon v. Kaleida Health*,
   299 F.R.D. 380 (W.D.N.Y. 2014)............................................................30, 35

*Guzman v. City of N.Y.*,
   93 F. Supp. 3d 248 (S.D.N.Y. 2015)......................................................25-26

*Guzman v. Macy's Retail Holdings, Inc.*,
   2010 U.S. Dist. LEXIS 29544 (S.D.N.Y. Mar. 29, 2010) ..........................23

*Johnson v. Strive E. Harlem Emp't Grp.*,
   990 F. Supp. 2d 435 (S.D.N.Y. 2014)........................................................22

*Kessler v. Westchester Cty. Dep't of Soc. Servs.*,
   461 F.3d 199 (2d Cir. 2006)........................................................................19

*Kirkland v. New York City Transit Auth.*,
   2015 U.S. Dist. LEXIS 118308 (S.D.N.Y. Sept. 3, 2015) ...........................24

*Kolesnikow v. Hudson Valley Hosp. Ctr.*,
   622 F. Supp. 2d 98 (S.D.N.Y. 2009)....................................................30, 31

*Kuebel v. Black & Decker, Inc.*,
   643 F.3d 352 (2d Cir. 2011)..........................................................30, 31, 34

*Levine v. Unity Health Sys.*,
   847 F. Supp. 2d 507 (W.D.N.Y. 2012) .......................................................29

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)....................................................................................19

*McGlone v. Contract Callers, Inc.*,
   49 F. Supp. 3d 364, 371 (S.D.N.Y. 2014) ..................................................30

*McGrath v. Cent. Masonry Corp.*,
   2009 U.S. Dist. LEXIS 94870 (D. Colo. Sept. 29, 2009) .....................30, 32

*Melman v. Montefiore Med. Ctr.*,
   98 A.D.3d 107 (1st Dep't 2012) .................................................................19

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
   715 F.3d 102 (2d Cir. 2013)........................................................................19

*Murray v. Visiting Nurse Services of N.Y.*,
   528 F. Supp. 2d 257 (S.D.N.Y. 2007).........................................................25

*Paul v. Lenox Hill Hosp.*,
   2015 U.S. Dist. LEXIS 16548 (E.D.N.Y. Jan. 15, 2016) ......................29, 31

iv

*Quinn v. Green Tree Credit Corp.*,
  159 F. 3d 759 (2d Cir. 1998) .................................................................................20

*Ragin v. E. Ramapo Cent. Sch. Dist.*,
  2010 U.S. Dist. LEXIS 32576 (S.D.N.Y. Mar. 31, 2010) .......................................23

*Sotomayor v. City of New York*,
  862 F. Supp. 2d 226 (E.D.N.Y. 2012) ...................................................................25

*Williams v. N.Y.C. Hous. Auth.*,
  61 A.D.3d 62 (1st Dep't 2009) .............................................................................22

*Ya-Chen Chen v. City Univ. of N.Y.*,
  805 F.3d 59 (2d Cir. 2015)...........................................................................19, 20

**Rules and Statutes**

8 NYCRR § 52.30............................................................................................28

12 NYCRR § 142-2.14(c)(4)(iii) ......................................................................27

14 NYCRR § 599.10 ...........................................................................4, 14, 24

N.Y. Educ. Law § 7704(1)(b) ..........................................................................28

N.Y. Educ. Law § 7704(2)(b) ..........................................................................28

**Other Authorities**

FLSA 2005-50, https://www.dol.gov/whd/
  opinion/FLSA/2005/-2005_11_04_50_FLSA.htm (Nov. 4, 2005) ..........................................29

NYSED LMSW License Requirements.
  *www.op.nysed.gov/prof/sw/lmsw.htm* ...................................................................28

## PRELIMINARY STATEMENT

Plaintiffs Maryam Khansari, Iby DeGeorge-Gearey, and Maria Daidone are former Clinicians of Fordham Tremont Community Mental Health Center's Adult Outpatient Clinic which is affiliated with St. Barnabas Hospital ("SBH" or "Hospital"). Plaintiffs, who commenced this action for the Hospital's alleged failure to pay overtime for hours worked in excess of 40 in a workweek in violation of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL") (Counts V and VI), and failure to provide proper wage statements in violation of the NYLL Wage Theft Prevention Act (Count VII), also invoked supplemental jurisdiction to claim that Defendant terminated their employment and subjected them to a hostile work environment on the basis of gender, age and disability in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* (the "NYCHRL") (Counts I to IV).[1]

Defendant is entitled to summary judgment and Plaintiffs' Second Amended Complaint ("SAC") should be dismissed in its entirety. Plaintiffs' discrimination and retaliation claims must be dismissed based on the record evidence which shows that the Hospital had legitimate grounds to terminate their employment. Specifically, the record evidence demonstrates that each of the Plaintiffs forged patient signatures onto patient treatment plans, that by doing so represented they had individually met with patients and provided them with a treatment plan-- when in fact they had never met with the patient on the indicated date. After the Plaintiffs' misconduct was first discovered, SBH's compliance officer fully investigated the allegations of

---

[1] Plaintiffs filed their first Complaint on March 11, 2015. (DE 1). Only Maryam Khansari and Maria Kumagay were Named Plaintiffs. (*Id*). On March 25, 2015, Plaintiffs filed their First Amended Complaint ("FAC") in which they asserted the same claims as their first Complaint but added Iby DeGeorge-Gearey as a Named Plaintiff. (DE 5). On July 7, 2015, Plaintiffs filed their Second Amended Complaint adding Maria Daidone as a Named Plaintiff. (DEs 17, 18). Plaintiff Maria Kumagay was dismissed from this action without prejudice on May 12, 2016.

fraud against them and found the falsifications to have occurred on many occasions. As will be set forth in more detail below, Khansari, DeGeorge and Daidone each admit that the patient signatures in question are not those of the patient, rather they were copied from a prior treatment plan. They also admitted that they did not provide the treatment plan to the patient. While they offer justifications for their conduct, the Plaintiffs' behavior as professional social workers was wholly unacceptable. Simply put, they denied patients appropriate services by failing to provide them with a treatment plan and then covered up their misdeed by forging the patient's signature onto a treatment plan which indicated that the service had been provided and the treatment plan discussed. On the basis of the Plaintiffs' representations, the physician was then able to assume that the patients were being properly cared for at the Hospital.

In addition, the record evidence shows that Plaintiffs' claims of gender, age and disability harassment by their two female supervisors, one of whom was 68, and one male supervisor have no support in the record. While Plaintiffs complain that their supervisors micromanaged them and expected them to comply with Office of Mental Health regulations, they have adduced no evidence that their supervisors' conduct was based on their gender, age or disability. More specifically, there is no evidence of any age, gender or disability bias statements. There is no evidence of a hostile work environment among the 10 women and two men who worked at Fordham Tremont Community Mental Health Center's Adult Outpatient Clinic.

Defendant is likewise entitled to summary judgment on Plaintiffs' claims for unpaid overtime under the FLSA and the NYLL as the Hospital's detailed time entry records show that Plaintiffs were paid for all of the time they worked. While plaintiffs claim to have falsified their time entries, they admit they never told anyone of the falsifications and could not even identify one day on which they worked more hours than recorded on the Hospital's electronic record

FIRM:38194012

system.  Absent any substantial evidence of the Hospital's failure to properly pay Plaintiffs, the Hospital is entitled to summary judgment on their FLSA claims.

Plaintiffs are exempt employees under the NYLL pursuant to the "bona fide professional" exemption.  They are not entitled to overtime compensation under that statute.  Even if they are covered by the NYLL, Plaintiffs have not established that they worked any "off the clock" hours in excess of 40 in any workweek entitling them to overtime compensation under the NYLL.

Finally, Plaintiffs' Wage Theft Prevention Act ("WTPA") claims fail for the same reason that their overtime claims fail, *i.e.*, they cannot establish that they worked any "off the clock" hours and, therefore, there was nothing inaccurate about their paystubs.

## STATEMENT OF FACTS

### A.    Plaintiffs' Employment

#### (i)    Plaintiffs' Duties

SBH is a New York not-for-profit community hospital located in the Bronx.  (Withim Decl. ¶ 2).  Plaintiffs are former Clinicians of SBH's Fordham Tremont Community Mental Health Center ("FTCMHC"). Khansari worked as a Clinician since March 21, 2000; DeGeorge since October 30, 2006; and Daidone since 1989. (Khansari Dep. 13:18-20; DeGeorge Dep. 36:3-5; Daidone Dep. 56:15-17).  Khansari was 64 at the time of her discharge, DeGeorge 70, and Daidone 64.  (Khansari Dep. 255:22-23; DeGeorge Dep. 21:8-9; Daidone Dep. 8:6-7).

Plaintiffs worked in the Adult Outpatient Clinic ("AOC").  (SAC, ¶¶ 20, 22, 23).  They treated adult patients with mental health issues, such as depression, anxiety, schizophrenia, bipolar disorder, etc. (Quinones Dep. 19:7-20).  Clinicians were expected to see 40 patients each week (their level of service "LOS"), either in group or individual sessions lasting at least 30 minutes. (Daidone Dep. 135:21-24; 180:23 to 181:11; Quinones Dep. 20:15-20, 21:6-18).  They treated patients through (among other things) individual and group therapy, assessed patient

progress, and formulated progress notes and Treatment Plans ("TPs"). (Khansari Dep. 17:19-23, 18:19-23, 19:16-22).

A progress note memorializes the clinician's meeting with a patient, and they are required to be completed within 24 hours of seeing the patient. (DeGeorge Dep. 70:9-15, 72:4-7). A TP assesses the mental health status and needs of the patient and determines what services may be provided to assist the patient. (14 NYCRR § 599.10(a)). Clinicians formulate the TP with the patient's input and update it every 90 days. (DiGia Decl. Ex. 5 at 56-57; Khansari Dep. 116:7-24). It is supposed to be prepared during the session with the patient. (Withim Dep. 91:13-16, 120:14-21; Quinones Dep. 66:10-17). To ensure that patients participate in the creation of the TP and agree with its content, the patient must sign it. (599.10(f)). Besides being mandated by New York State Office of Mental Health ("OMH") regulations, these requirements are also set forth in the Hospital's TP policies. (Khansari Dep. 132:25 to 133:6; DiGia Decl. Exs. 7, 8, 9; DeGeorge Dep. 63:19 to 67:7). SBH policy specifically states that Clinicians are to "develop[] the [TP] co-jointly with the client and obtain[] their input and signature during the last face-to-face contact prior to the [TP] due date." (DiGia Decl. Ex. 10; Khansari Dep. 224:7 to 226:8). A lack of a patient signature is only excused "if the reasons for non-participation by the recipient are documented in the [TP]." (599.10(f)).

### (ii)   Preparation of TPs

The AOC employed two clinical supervisors to oversee its twelve Clinicians. (Quinones Dep. 28:12-20). Prior to May 2015, ten of the Clinicians were female and two male. (Khansari Dep. 303:2-25; DeGeorge Dep. 151:20 to152:15). The supervisors reviewed each Clinicians' TP (as well as their notes) for conformance with OMH regulations (599.10). (Withim Dep. 9:5-20, 96:14-21, 98:3-10, 145:2-6). If a TP did not meet OMH standards, the supervisor rejected it and the TP had to be revised. (Withim Dep. 98:11-21, 145:7-10; Small Dep. 93:10-19). Supervisors

met with each clinician once a week for "supervision" and any issues with the TPs were discussed during the session. (Withim Dep. 92:8-13, 101:1-11). Khansari and DeGeorge were supervised by Alma Withim starting in September 2014. (Withim Dep. 8:11-17). Daidone was supervised by Brian Marren and later by Terrence O'Gara. (Daidone Dep. 18:7 to 19:5).

Around June 2013, the AOC implemented Electronic Medical Records ("EMR") software that permitted Clinicians to (among other things) create TPs and progress notes electronically.[2] (DeGeorge Dep. 74:10-13; Daidone Dep. 205:23 to 206:9). The EMR included a "copy-forward" function that allowed Clinicians to select portions of a past TP or note and copy its content into a new TP or note. (Withim Dep. 133:3-19, 147:5-15; DiGia Decl. Ex. 13). Clicking a copy-forward button generated a pop-up window with three columns: in the left column, the clinician selected the TP for copying; in the right column, the software displayed the TP selected for copying; and in the middle column, the software offered sections of the TP that Clinicians could choose to copy (*e.g.*, the diagnosis, goals and objectives, etc.).[3] (Withim Dep. 134:4 to 135:24, 138:9 to 139:25; Withim Decl. Exs. 1, 2). An empty box appeared next to each choice in the middle column, and the software would not copy any section unless it was checked-off. (Withim Dep. 139:10 to 140:5; Jackson Decl. Ex. 1 at 007754). A separate box for the patient's signature was also included. (Withim Dep. 140:10-11). Thus, a Clinician would have to affirmatively choose to copy forward a patient signature. It did not happen automatically. Moreover, any information selected for copying forward (even by mistake) could subsequently

---

[2] The EMR system tracked the date and time a Clinician accessed the medical records of a patient. (Withim Decl. ¶ 3). Defendant produced over 600 audit log pages of these Electronic Medical Records. (DiGia Decl. ¶ 3). Sample pages of this production for each Plaintiff are attached as Exhibit 12 to the DiGia Declaration.

[3] Although the functionality existed to copy a patient's signature, it was never permissible to do so and Clinicians were never authorized to copy patient signatures. (Withim Dep. 140:6-14, 147:20 to 148:4, Small Dep. 56:10-15).

be erased from the TP it was copied into.  (Withim Dep. 135:8-21).

**B.     Plaintiffs' Retaliation Claims**

   **(i)     Khansari Forged Patient Signatures**

On February 25, 2015, during a review of Khansari's TPs, Withim discovered that Khansari used the copy-forward feature to copy a patient's signature (and the date of the signature) from a prior TP.  (Withim Decl. ¶ 8 and Ex. 3 at 007429; Withim Dep. 153:3-10, 156:15-22, 308:12-22).  Withim brought this issue to her attention in March.  (Withim Dep. 152:24 to 153:13).  In response, Khansari claimed that she did not know how to copy-forward TPs without also copying the patient signature.  (Withim Dep. 153:14 to 154:12).  This was false. Withim showed Khansari several TPs which Khansari had prepared using the copy forward feature but which did not include a copied patient signature.  (Withim Dep. 153:14 to 154:12). Withim cautioned Khansari that she should never copy a patient's signature as it was illegal and instructed Khansari to remove the signature, have the patient sign the TP during her next visit, and change its date.  (Withim Decl. Ex. 3 at 007429; Withim Dep. 154:13-14).  Khansari partially complied with the instructions and, by March 27, had removed the signature.  (Withim Decl. Ex. 4 at 007499).  Her compliance, however, was short-lived.

Despite these instructions, Khansari again copied forward patient signatures onto three other TPs. (Withim Decl. Ex. 5; Withim Dep. 154:10 to 155:4).  Withim discovered this and informed Khansari, during supervision on March 31, 2015, that "this is fraud" and that the copied signatures "must be removed." (*Id.*).

Not only did Khansari not erase the signatures, but Withim discovered that Khansari had copied patient signatures onto several other TPs.  (Withim Dep. 154:15-18, 157:5-9).  Withim thus concluded that Khansari was purposefully copying patient signatures forward.  (Withim Dep. 157:5-9, 185:18-21, 159:10-15).  Moreover, a review of Khansari's TPs shows that

-6-

Khansari finalized other TPs with copied signatures even *prior* to Withim's hire:

- 
- 

**REDACTED**
**FILED UNDER SEAL**

- 

### (ii)   DeGeorge Forged Patient Signatures

After discovering Khansari's conduct, Withim began to review TPs submitted for approval by the other Clinicians she supervised by checking that the signature was not copied from an old TP onto a new TP . (Withim Dep. 161:25 to 162:9, 314:8-22). She discovered that DeGeorge was also copying patient signatures from one TP to another. (Withim Dep. 161:23 to 162:9; Withim Decl. ¶ 15 and Ex. 10). She asked DeGeorge in early April about this and asked her to fix it and remove the copied signatures. (Withim Dep. 162:10-16, 183:21 to 184:5).

DeGeorge refused. (Withim Dep. 183:21 to 184:5, 185:9-13). In fact,

**REDACTED**
**FILED UNDER SEAL**

(DiGia Decl. Exs. 14-16; DeGeorge Dep. 169:20 to 171:8, 239:22 to 240:18; Withim Decl. Ex. 11).  Given that DeGeorge continued to forge signatures, after being specifically instructed not to, and did not correct the prior TPs, Withim came to the conclusion that DeGeorge (like Khansari) did this purposefully and intended to

commit fraud. (Withim Dep. 151:10 to 152:16, 156:4-14, 157:25 to 158:24, 185:9-21).

Withim reported Khansari and DeGeorge to her supervisor Edgardo Quinones (AOC Director since February 2015) and then, on April 29, 2015, to Cassandra Jackson, SBH's Compliance Officer. (Jackson Dep. 7:20-23, 15:21 to 17:20, 29:2-7, 29:22 to 30:09; Jackson Decl. Ex. 1 at 7752-56). Withim explained to Jackson that she was concerned that DeGeorge and Khansari were fraudulently cloning patient signatures and provided her with copies of the signatures at issue. (Jackson Dep. 34:19 to 35:9; Jackson Decl. Ex. 1 at 7753, 7755).

### (iii)    Cassandra Jackson's Investigation.

Jackson separately interviewed DeGeorge and Khansari. (Jackson Dep. 61:24 to 62:17, 63:13-20, 64:25 to 65:12). DeGeorge admitted that she had copied patient signatures, but claimed that she did so on all her TPs pursuant to Withim's instructions to Clinicians to copy forward all portions of a prior TP. (Jackson Dep. 54:9-18; DeGeorge Dep. 85:13 to 86:25, 103:12-20, 105:6-9). Khansari likewise admitted to copying patient signatures. (Jackson Dep. 65:13-17). She too blamed Withim. She explained to Jackson (and testified at her deposition) that Withim told her to click all of the boxes to copy forward everything. (Jackson Dep. 65:3-21; Khansari Dep. 93:24 to 94:14).

In light of DeGeorge's assertions, Jackson instructed the head of Behavioral Health, Patty Small, to have all FTCMHC supervisors randomly inspect four consecutive TPs of one patient of each Clinician that they supervised to assess whether they contained signatures that were copied forward. (Jackson Dep. 54:22 to 55:7, 68:14-22, 89:3-12; Jackson Decl. Ex. 2). The review discovered that only one other clinician--Daidone--had copied forward patient signatures.[4]

---

[4] The fourth Clinician to have engaged in the same conduct was Kumagay who was on a leave of absence from March 2015 until July 2016. (Jackson Decl. ¶ 9). Upon her return, her employment was terminated for the same reason as the three Plaintiffs. (Jackson Decl. ¶ 10).

(Jackson Dep. 72:5-11, 75:10-17, 77:23-25, 78:11-13; Jackson Decl. Exs. 3; 4).

Jackson then met with Daidone who likewise admitted that she copied patient signatures. (Jackson Dep. 82:24 to 83:5; Daidone Dep. 125:8-10, 126:17-21). Daidone also admitted (as she did at her deposition) that she prepared some of the TPs with a copied-forward signature before they were due and before even meeting with the patient. (Jackson Decl. ¶ 7; Daidone Dep. 153:8 to 154:18; DiGia Decl. Ex. 18). Daidone further admitted that it was improper to copy forward the signatures and not to erase them (which she knew how to do). (Daidone Dep. 74:24 to 75:12, 81:21-24, 89:18-20).

Jackson also met with Withim and the head of IT, Renee Hulen. (Jackson Dep. 55:23 to 56:3; Jackson Decl. Ex. 1 at 7754). Withim explained that in October or November 2014, she provided training on the use of the EMR copy forward feature, but was specific that copying forward had to meet OMH guidelines and that the client had to sign a new TP each time. (Jackson Decl. ¶ 8; Withim Dep. 124:9-24). Hulen rejected DeGeorge's assertion that the EMR system automatically copied forward the signature, but rather confirmed that a Clinician had to manually select the option to copy the patient's signature forward. (Jackson Decl. Ex. 1 at 7754; Jackson Decl. ¶ 8).

Jackson concluded that Khansari's and DeGeorge's explanation that Withim instructed all staff to copy forward signatures could not be true, as the audit identified only Plaintiffs out of 49 Clinicians as having copied signatures. (*Id.*; Jackson Dep. 90:9-20). Further, DeGeorge had copied forward signatures only on some of her TPs, indicating that she was well aware of how to properly prepare a TP. (Jackson Decl. Ex. 1 at 7754; Jackson Dep. 128:3-8). Jackson therefore concluded that the allegation that Plaintiffs improperly copied-forward signatures was substantiated. (*Id.* & 128:16-23). Copying patient signatures was fraudulent as the TPs attested

that the client had participated in a discussion about their TP and agreed to what was discussed. (Jackson Dep. 85:12-20). The conduct put SBH at risk as SBH had been paid for services without legitimate documentation that these services had, in fact, been provided. (Jackson Decl. Ex. 1 at 7754; Jackson Dep. 98:11-17).

Human Resources terminated Plaintiffs' employment effective May 15, 2015, as they violated SBH's requirements regarding TPs and patient signatures. (Khansari Dep. 23:22 to 24:3, 61:6-16; DeGeorge Dep. 37:11-13, 38:10 to 39:10; Daidone Dep. 126:25 to 127:9; Jackson 84:23 to 85:11, 113:19-24). Neither Withim, Quinones (who was 54), nor Judy Birch (the director of AOC until January 2015), were involved in the decision. (Withim Dep. 163:11 to 164:15, 166:12-16, Withim Decl. ¶ 18; Quinones Dep. 128:24 to 129:23, 5:11-12; Birch Dep. 161:7-9).

## C.   Plaintiffs' Hostile Work Environment Claims

At all times relevant in this lawsuit, SBH had zero tolerance for discrimination in the workplace and maintained policies and procedures to insure that all employees knew its policies. (DiGia Decl. Ex. 19 at 27-29). These policies and procedures: (i) prohibit discrimination in the workplace; (ii) provide avenues of complaint for employees to report any experienced or witnessed discrimination or harassment; and (iii) strictly forbid retaliation against anyone for reporting discrimination or harassment. (*Id.*). Plaintiffs were aware of the policies from the Employee Handbook (which they received) and from annual, mandatory anti-discrimination and anti-harassment training that they attended. (Khansari Dep. 153:10-16, 165:18 to 166:8; DiGia Decl. Ex. 29 at D-000589; Daidone Dep. 42:6-9, 160:12 to 161:19).

### (i)   Khansari's and DeGeorge's Claims.

Khansari and DeGeorge allege that Withim subjected them to harassment by setting expectations that they were unable to meet to set them up to fail. (DiGia Decl. Exs. 20, 31,

-10-

Khansari Dep. 97:10 to 98:12, 183:20 to 184:2; SAC ¶ 7).  Plaintiffs have no proof of this and, even if Withim did, they have no proof it was related to their age or gender.

Following her hire, Withim discovered that several Clinicians--Kumagay, Khansari, DeGeorge, Angel Marcano and Marian Steele Murray, were not completing their progress notes and TPs on time and, therefore, Withim verbally counseled and disciplined several Clinicians, including the male Clinician Marcano (born in 1950) and Steele Murray (born in 1951), for late progress notes, late TPs, and other infractions.  (Withim Dep. 59:18 to 60:19, 317:19 to 318:4; DiGia Decl. Ex. 21 at 1; DeGeorge Dep. 183:21 to 184:9, 185:8-19; Withim Decl. ¶ 19). Marcano and Steele Murray improved their work and caught up.  (Withim Dep. 60:15-22; DiGia Decl. Ex. 21 at 2).  Khansari and DeGeorge did not and, therefore, Withim issued written warnings to them.  (Withim Dep. 60:15-22).

### (a)   Khansari's Allegations against Withim.

Khansari's written warning informed her that as of December 17, 2014, she was missing 98 progress notes and 45 TPs.  (DiGia Decl. Ex. 22; Khansari Dep. 178:11-16).  On March 6, 2015, she was issued another written warning because her work did not improve: she had numerous progress notes and 65 TPs overdue; the warning also noted that she was not meeting required weekly LOS.  (DiGia Decl. Ex. 23; Khansari Dep. 306:18 to 307:22).  These deficiencies were consistent with problems Khansari had in the past: her 2013 performance evaluation noted that that she was late on TPs and warned her that she was not meeting her weekly required LOS.  (DiGia Decl. Ex. 24).

Following the first warning, Khansari filed a grievance with human resources on December 22, 2014, alleging that Withim was setting her up to fail with unreasonable expectations (the grievance did not state which expectations were unreasonable or why), and creating a general hostile work environment (she did not state on what protected category).

-11-

(DiGia Decl. Ex. 20).  She disputed (without providing any proof) that the warning inaccurately described how many notes she completed in December, but she did not dispute that Withim accurately described the progress notes missing for September, October, and November 2014. (DiGia Decl. Ex. 20).  At her deposition, Khansari likewise admitted that the December 17 warning accurately described that she had not completed all her notes.  (Khansari Dep. 179:6-19, 182:18 to 183:4).  She also did not dispute that 45 of her TPs were missing.  (*Id.*). She testified that she completed some TPs but that Withim refused to sign them and told her that if they were not done correctly, they were not done.  (Khansari Dep. 128:17-25).

While Khansari testified that she did not complete her work because it was impossible to do so, she admitted that Venecio Morales was able to. (Khansari Dep. 139:4-6, 206:22-24).  In addition, Daidone testified that she never had any issues completing her paperwork once the EMR system was implemented, and was never written up for not completing her paperwork. (Daidone Dep. 118:16 to 119:8, 120:19 to 121:2).

Khansari also accused Withim in her December 22 grievance of reprimanding her for being a few minutes late to a meeting, but "treat[ing] other colleagues more professionally for being late for the same meeting," and for writing on her 2014 evaluation that she took 29 sick days, when she only "took an hour here or there to attend doctor appointments." (DiGia Decl. Ex. 20). She now also alleges that before being written up, in supervision, Withim told her "if I cannot complete the work, they need new blood, fresh blood," meaning that "if [she] cannot do the job, [she] ha[s] to leave." (Khansari Dep. 124:14 to 125:21, 141:10-25). Further, she alleged that Withim yelled at her while she was with a client and in front of her group for wanting to ask her for a key. (Khansari Dep. 128:4-16; 265:3-10).  She provides no evidence, however, to link any of this conduct to either her age or sex.

(b)     **DeGeorge's Allegations against Withim.**

DeGeorge was warned on January 29, 2015 that she was 63 notes and 58 TPs behind. (DiGia Decl. Ex. 25; DeGeorge Dep. 212:24 to 213:4).   On February 20, 2015, she was warned again because she was behind 83 notes (28 of which were not even written) and 59 TPs. (DiGia Decl. Ex. 26; DeGeorge Dep. 287:15-20).   By March 12, 2015, that increased to 95 notes and 65 TPs.  (DiGia Decl. Ex. 27; DeGeorge Dep. 289:14-22).   At the same time, she was written up for not meeting her expected LOS of 40 patients a week but instead averaged 31 per week, *id.,* below that of male Clinicians Morales and Marcano:

|          | Sept '14 | Oct '14 | Nov '14 | Dec '14 | Jan '15 | Feb '15 | Mar '15 | April '15 | May '15 |
|----------|----------|---------|---------|---------|---------|---------|---------|-----------|---------|
| DeGeorge | 147      | 108     | 107     | 132     | 129     | 113     | 87      | 122       | 67      |
| Khansari | 127      | 114     | 90      | 134     | 98      | 65      | 104     | 149       | 54      |
| Morales  | 147      | 134     | 137     | 155     | 149     | 162     | 147     | 216       | 156     |
| Marcano  | 205      | 203     | 140     | 166     | 169     | 163     | 156     | 181       | 155     |

(Withim Decl. Ex. 12).

This criticism was not new for DeGeorge: DeGeorge's 2009 and 2010 performance reviews rated her as not meeting standards regarding completion of TPs.  (DiGia Decl. Exs. 28, 29; DeGeorge Dep. 286:17-24, 287:3-9).  Her 2009 review also noted that her TPs "need[ed] to be completed on time."   Her 2011 review rated her as not meeting expectations in almost all areas and recommended that she be placed on probation.  (DiGia Decl. Ex. 30).  It also stated that "[u]ntil recently (the month of August), the majority of [TP]s frequently contained problems related to the number of problem/goal statements, and not reflecting the diagnosis, . . . Approximately 15-20 % of [TP]s have not been completed on time or were dated on days that clinician was not in the office." (*Id.* at p. 6).   It also noted that "[m]any charts have had missing / incomplete progress notes for multiple sessions, some for months at a time." (*Id.*).

DeGeorge filed a complaint against Withim on February 20, 2015; she alleged that the January 29 and February 20 warnings were the result of Withim's harassment of her because of

her age and disability (but not gender).  (DiGia Decl. Ex. 31 at p. 1).  DeGeorge admitted that it was possible that she was behind on some of the TPs but could not remember how many. (DeGeorge Dep. 62:4-21, 199:6-9, 200:19-22).

DeGeorge now claims that the disciplinary actions are inaccurate or grossly exaggerated. (DeGeorge Dep. 188:14-20, 197:20 to 198:6, 200:9-18, 214:4 to 215:4, 289:23 to 290:15).   In support of this argument, she testified that she printed out a stack of documents to prove that she did the TPs and notes and that she brought them with her to her January 29, 2015 meeting. (DeGeorge Dep. 218:16 to 219:22). DeGeorge, however, refused to show the documents to anyone (including Withim who asked to see them), she did not submit them with her February 20, 2015 complaint, and she has not produced them in this litigation.  (Id.; DiGia Decl. Ex. 31 at 00003-04; Withim Decl. ¶ 20).  Withim told her that these purported completed files were not in the EMR, and that those in EMR were below standards set by OMH's Section 599.10 and SBH's policies. (Withim Dep. 96:22 to 97:11, 98:3-7; 14 NYCRR § 599.10; DiGia Decl. Ex. 32).

She also complained of being micromanaged, being yelled at, and being belittled in supervision. (DiGia Decl. Ex. 31 at pp. 00002-00004).  SBH met with DeGeorge and others and investigated her allegations, and informed her on March 24, 2015 that her objections were with "how [her] supervisor was attempting to correct [her] work, modify deadlines, and in numerous ways hold you accountable for [her] work."  (DiGia Decl. Ex. 37 at 2).   Like Khansari, DeGeorge did not link any of this conduct to her age or sex.

### (c)   Allegations That Female Clinicians Were Treated Differently.

DeGeorge and Khansari also allege that they were treated differently than male employees: they allege that Withim had to sign off on their progress notes whereas a male Clinician Morales signed-off on his own paperwork instead of his supervisor. (SAC ¶¶ 51-52; DiGia Decl. Ex. 31 at p. 4).  OMH only allows Licensed Clinical Social Workers ("LCSW") to

sign off on their notes.   (Withim Dep. 335:17-23).   Khansari and Morales were LCSWs; DeGeorge was not.   (DeGeorge Dep. 23:23-25; Khansari Dep. 25:16-17, Withim Decl. ¶ 21). Further, SBH Supervisors have the discretion to allow LCSW Clinicians to sign off on their own notes. (Small Dep. 138:5-11).  Withim required that all Clinicians under her supervision – male and female – provide their progress notes to her for approval.  (Withim Decl. ¶ 21). Withim did not supervise Morales.  (Withim Dep. 336:5-6).

DeGeorge and Khansari also claim that male Clinicians were treated preferentially because all of Morales' vacations were approved while those of women were delayed or denied. (Khansari Dep. 57:7-15; DeGeorge Dep. 151:13-19). Vacation time at AOC is granted by the director and must be requested ahead of time.  (Quinones Dep. 142:13-18; Birch Dep. 102:9 to 103:2). DeGeorge testified that Birch did not inform her in time that her vacation was approved. (DiGia Decl. Ex. 31).  Khansari could not remember any instances where her vacation request was denied.  (Khansari Dep. 58:2-18). Daidone testified that she was never denied vacation time. (Daidone Dep. 174:23 to 175:9).

### (ii)   Daidone's Discrimination Claims

Daidone never made a complaint of unlawful discrimination or harassment while employed at SBH.  (Daidone Dep. 161:20-23).   Nevertheless, she alleges that Quinones, the director of AOC, discriminated against her on the basis of age.  (Daidone Dep. 163:7 to 164:25, 165:9 to 166:8).  She alleges that he changed how she had to write progress notes, requiring her to meet minimum standards, when nobody knew what the minimum standards were.  (*Id.*).

She also alleges that she was treated differently than younger employees (Yohanny Santana, a female in her thirties) and younger male Clinicians (Morales and Marcano, who were in their fifties). (Daidone Dep. 179:16 to 180:12).  She alleges that Santana was assigned far less rigorous workload expectations and that Morales and Marcano were assigned fewer patients.

-15-

(Daidone Dep. 179:16-20, 180:13-16).

### (iii)    Plaintiffs' Allegations Against Other Supervisors

Plaintiffs allege that Birch, who is female and who was about 68 as of February 2015, harassed them because she referred to Khansari and Daidone as prima donnas and once stated "all of these older women think they're better than everyone else." (Khansari Dep. 174:12-25, 175:7-10; Daidone Dep. 61:16-24, 63:16-21, 169:13-23; Birch Dep. 5:15-16). DeGeorge also alleges that Birch made negative remarks about her and criticized her performance. (DeGeorge Dep. 49:6-18). Plaintiffs, however, ignore the fact that Birch's management style was directed toward all employees regardless of sex or age--twelve employees filed a Complaint with the union accusing Birch of "unfair, unreasonable and aggressive management style," refusal to allow staff to use vacation time and personal time, yelling at staff and patients, reprimanding staff in front of patients, and "systematically intimidating and threatening staff." (Khansari Dep. 211:2-6; DiGia Decl. Ex. 47 at 8-10). It was not directed only toward Plaintiffs and had nothing to do with their sex or age.

### (iv)    DeGeorge's Disability Discrimination and Retaliation Claims

DeGeorge has a heart condition.  (DiGia Decl. Ex. 34). In the fall of 2012, SBH decided to extend the hours of the FTCMHC until 7 pm each day to better meet the needs of its patients. (*Id.*).[5]  At this time, DeGeorge worked from 8:30 am – 4:30 pm Monday through Friday. (*Id.*). Each Clinician was required to stay until 7 pm one day per week. After DeGeorge had failed to change her schedule, on August 15, 2013, Birch informed plaintiff that SBH "will give [her] a bit more time to think about it." (*Id.*). In response, on August 26, 2013, DeGeorge requested that her schedule be changed from 10 am to 6 pm on Tuesday, stating that "the Tuesday schedule will

---

[5] Previously, the FTCMHC was only open until 7 pm a few days of the week.

satisfy my request for reasonable accommodation." (DiGia Decl. Ex. 35; DeGeorge Dep. 299:8-12).  SBH granted her request, and DeGeorge began to work until 6 pm on September 17, 2013. (DeGeorge Dep. 299:13-16; DiGia Decl. Ex. 36 at D-3448).  Nevertheless, in November 2013, DeGeorge filed a charge with the EEOC alleging that SBH "den[ied] [her] request for reasonable accommodation." (DiGia Decl. Ex. 34).

In 2015, Withim noticed that DeGeorge (unlike other Clinicians) did not work until 7 pm once a week, ending her shift at 6 pm instead.  (Withim Decl. Ex. 13). Because DeGeorge claimed that she was exempt from working until 7 pm, Withim reached out to Edith Diaz in Human Resources on February 13, 2015, to determine if DeGeorge's personnel file contained any restrictions on her ability to work until 7 pm. (Id.).  Diaz found no such restriction. (DiGia Decl. Ex. 37 at 1).  DeGeorge thereafter complained on February 20, 2015, that Withim questioned her need for accommodation and told her that she had to work until 7 pm once a week like all other Clinicians (instead of 6 pm).  (DiGia Decl. Ex. 31 at 00004).  In response, Human Resources informed DeGeorge on March 3, 2015 that it was not able to assess the specific disability for which she required accommodation and that she needed to submit a form from her doctor to explain why she required an accommodation. (Withim Decl. Ex. 14).  As of March 24, 2015, DeGeorge had not submitted the requested form and still had not as of her termination. (DiGia Decl. Ex. 37 at 1).

**D.   Defendant's Wage and Hour Policies**

Plaintiffs were scheduled to work seven hours per day with one hour of unpaid lunch. (Khansari Dep. 42:18-20, 44:6-9, 280:25; Daidone Dep. 130:20-22; SAC, ¶ 93).  Defendant kept close track of the hours Plaintiffs worked.  They were required to enter all time worked each day by clocking-in and clocking-out through SBH's ADP E-Time System.  (Khansari Dep. 280:14-

20; Daidone Dep. 21:14-16; SAC, ¶ 94).[6]  Each Plaintiff testified that either their clock-in and

clock-out times were accurate or they had no basis to dispute them.  (Khansari Dep. 40:16-41:3,

45:4-13, 18-24, 280:14-20; Daidone Dep. 16:6-17; 21:3-5, 28:5-7; DeGeorge Dep. 279:20-280:4,

280:25-282:7).  In addition, since June 2013, SBH has maintained the EMR system which tracks

the exact time Plaintiffs accessed patient medical records.  Similarly, SBH has maintained for the

period of this lawsuit telephone logs that reflect the time Plaintiffs used the telephone.  (Khansari

Dep. 75:6-13, 76:15-17; DeGeorge Dep. 145:12-20; Daidone Dep. 32:6-12, 17-20).

     Pursuant to the Employee Handbook, SBH:

> discourage[ed] overtime work out of consideration for the needs of employees
> to have sufficient relief and rest. . . . Employees who are eligible for overtime
> under the Fair Labor Standards Act will be paid one and one half times their
> regular rate for time worked in excess of their normal full-time work-week.
>
> Overtime must be requested and authorized by the appropriate Department
> Head and Administration.  Employees will be expected to work the hours
> assigned and should not report for work more than fifteen (15) minutes before
> the time assigned and will be expected to leave their work areas no later than
> fifteen (15) minutes after the completion of their work shift.

(SAC, ¶ 95; *see also* Khansari Dep. 51:21-52:14, 255:7-16).

     Plaintiffs were also instructed that if overtime work was necessary, it had to be approved

in advance.  (Khansari Dep. 282:7-8; Daidone Dep. 127:25-128:3; DeGeorge Dep. 137:21-23;

Quinones Dep. 52:14-18; SAC, ¶ 14).

     Finally, Plaintiffs' supervisors regularly reminded Plaintiffs that they are not permitted to

---

[6] Sample pages from the Simplified Time Detail for each Plaintiff are attached as Exhibit 38 to
the DiGia Declaration. **The times reflected on these pages include the unpaid one hour lunch
Plaintiffs received.**  Defendant produced more than 150 pages of these reports for all three
Plaintiffs, including pages showing any adjustments made to their entries.  (DiGia Decl. ¶ 4.)
Sample pages from the User Call Detail for each Plaintiff are attached as Exhibit 39 to the DiGia
Declaration. Defendant produced more than 300 pages of these reports for all three Plaintiffs.
(DiGia Decl. ¶ 5).

work off-the-clock and that they should leave the office once clocked-out for the day. (Khansari Dep. 40:16-41:6, 50:24-51:23, 280:15-20, 282:7-8; Daidone Dep. 21:14-16, 145:8-20, 146:5-7; Birch Dep. 123:13-17). If a Clinician continued working after clocking out, they were specifically directed not to do that. (Birch Dep. 123:13-17).

## ARGUMENT

### POINT I: DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' NYCHRL RETALIATION CLAIMS.

"[A]n action brought under the NYCHRL . . . [is] analyzed both under [the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)] and the . . . 'mixed-motive' framework," which inquires into whether discrimination was a motivating factor in the adverse employment decision. *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 113 (1st Dep't 2012).

Under either framework, this means that "the plaintiff must show that she took an action opposing her employer's discrimination, . . . and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik v. Credit Agricole Cheuvreux N. Am.*, Inc., 715 F.3d 102, 112 (2d Cir. 2013). A plaintiff engaged in protected activity must "have had a good faith, reasonable belief that [s]he was opposing an [unlawful] employment practice made unlawful by [the statute]." *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006) (quotation omitted).

If the plaintiff meets her *prima facie* burden, the burden shifts to the defendant to proffer "legitimate reasons for its actions." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75-76 (2d Cir. 2015). "If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's 'reasons were pretextual,' . . . or that

-19-

the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on [retaliation]." *Id.* at 76 (quotation omitted).

A.   **Defendant Should be Granted Summary Judgment on Daidone's Retaliation Claims And DeGeorge's Retaliation Claim Based On Her Disability Because Neither Engaged In Any Protected Activity.**

Summary judgment on Daidone's retaliation claims is warranted because she did not engage in any protected activity.  She never complained of any harassment or discrimination while employed.  She was not a plaintiff when the other Plaintiffs filed the Complaint or the FAC, both in March 2015.  Instead, Daidone only became a party to the lawsuit on July 6, 2015, after she had been terminated. (DEs 17, 18).  Her retaliation claims fail as a matter of law.

DeGeorge's retaliation claim based on her disability should likewise be dismissed.  The FAC contains no factual allegations that could support a good faith, reasonable belief that she was being harassed on the basis of her disability.  The FAC merely relies on alleged time-barred events from 2009 and 2010, and her 2014 EEOC charge,[7] in which she alleged that SBH failed to accommodate her request not to work until 7 pm in 2013.  The former cannot support a valid claim, and the latter has no basis in fact: DeGeorge has admitted (and the evidence shows) that SBH accommodated her accommodation request **before she even filed the EEOC charge**.  Accordingly, neither the 2013 charge nor the FAC can constitute a protected activity. *See Quinn v. Green Tree Credit Corp.*, 159 F. 3d 759, 769 (2d Cir. 1998) (a complaint of harassment only constitutes a protected activity when the plaintiff can demonstrate that she had a *good faith, reasonable belief* that the underlying challenged actions of the employer violated the law).

B.   **Plaintiffs Were Terminated for Legitimate, Non-Retaliatory Reasons.**

Summary judgment on Plaintiffs' retaliation claims is also warranted because SBH

---

[7] The actual charge was filed in November 2013. (DeGeorge Dep. 297:14-16).

legitimately discharged Plaintiffs for fraudulent conduct.   An investigation uncovered that Plaintiffs (unlike other Clinicians) copied (*i.e.,* forged) patient signatures from one TP to another, which constituted fraud.   The TPs falsely attested that patients had participated in discussions about their treatment and agreed to what was discussed when they had not.   Plaintiffs DeGeorge and Khansari lied to the investigator to justify their conduct: (1) DeGeorge's assertion that she copied whole TPs as did all other Clinicians was contradicted by her own TPs as well as the fact that only 4 of 49 Clinicians were found to have engaged in that conduct; and (2) Khansari's assertion that she merely followed Withim's instruction is belied by (a) several TPs with a copied-forward signature prepared before Withim was hired, and (b) the fact that Withim expressly told her to remove the copied signatures and that she in fact knew how to do that, yet continued to use the copy-forward feature for signatures.[8]

Plaintiffs cannot cast doubt on SBH's reason for their discharge.   The only "evidence" of pretext that they can point to is the temporal proximity between their discharge and their complaint in this case, but "temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).   This is not a case where Plaintiffs have pointed to gender and age based animus: to the contrary, they accuse other women (one of whom is older than Khansari) of gender and age discrimination based on facially neutral conduct.   Temporal proximity alone therefore does not establish pretext. *See EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 859 n.30 (S.D.N.Y. 2013) (pretext not shown through mere temporal proximity where a negative performance review and reduction in compensation were not proven as discriminatory).   Defendant should therefore

---

[8] Daidone engaged in no protected activity.  Even if she had, since she admitted that the copying of the signatures was wrong and that she failed to remove the signatures even though she knew how to do so, SBH had legitimate, non-retaliatory reasons for firing her as well.

be granted summary judgment on Plaintiffs' NYCHRL retaliation claims.

## POINT II:  DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' HOSTILE WORK ENVIRONMENT CLAIMS

Plaintiffs' attempt to establish hostile work environment claims under the NYCHRL on account of their age, gender and disability (for DeGeorge) likewise fails.

The standard to prove harassment under the NYCHRL is the same as for discrimination. *See Johnson v. Strive E. Harlem Emp't Grp.*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) (explaining that the NYCHRL does not have separate standards for discrimination and harassment claims).  Plaintiffs must first show "by a preponderance of the evidence that [they have] been treated less well than other employees because of [her membership in a particular protected category]."  *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 78 (1st Dep't 2009).  An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (citation omitted), or by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group," *Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 20 (2d Cir. 2013) (citation omitted).

### A.    Plaintiffs Were Not Subjected To Any Discriminatory Conduct Or Comments.

Plaintiffs' allegations that they suffered gender and age harassment at the hands of Withim, Birch, and Quinones are without merit as the record contains no evidence that they were treated "less well" because of their gender or age.

As for Withim, Khansari and DeGeorge cannot point to any admissible evidence that

-22-

Withim's facially neutral disciplinary warnings were issued because of their gender or age.  As in *Campbell v. New York City Transit Auth.*, 93 F. Supp. 3d 148, 173 (E.D.N.Y. 2015), "Plaintiff[s] ha[ve] done no more than point to various ways in which [they feel[] [they] w[ere] mistreated and argue that it must have been because of [their] sex, age, or disability. This is not sufficient to sustain a claim of discrimination."  Plaintiffs' conclusory testimony and speculation to the contrary is not admissible evidence.  *See id.*; *see also Alfano v. Costello*, 294 F.3d 365, 377-78 (2d Cir. 2002) (a supervisor's formal counseling and unfairness that was facially sex-neutral could not support a harassment claim without evidence that it was motivated by the plaintiff's sex).

Same is true of Withim's managerial style (her interruption of their sessions and yelling at Plaintiffs during supervision): Plaintiffs can point to no evidence that this conduct was motivated by their gender or age.  *See Bir v. Pfizer, Inc.*, 510 F. App'x 29, 32-33 (2d Cir. 2013) (holding that allegations that the plaintiff's supervisor was "unpleasant, rude, and a poor manager," that he "screamed at her," and that he made facially sex-neutral comments was not evidence that these acts and comments were based on her sex).[9]

Withim's alleged comment to Khansari (Withim was 53, Khansari 64) that "if [she] cannot complete the work, they need new blood, fresh blood" is also not an ageist comment.  Courts have held that inferring age discrimination from that statement would be pure speculation, given that Withim stated nothing more than new employees could be hired if plaintiff could not

---

[9] *See also Ragin v. E. Ramapo Cent. Sch. Dist.*, 2010 U.S. Dist. LEXIS 32576, at *96-98 (S.D.N.Y. Mar. 31, 2010) (Gardephe, P.) (fourteen facially neutral allegations – including "false criticism" in performance review and "screaming at Plaintiff" did not establish hostile work environment because they "reference[d] facially-neutral, work-related conduct"); *Guzman v. Macy's Retail Holdings, Inc.*, 2010 U.S. Dist. LEXIS 29544 at *12-13 n.2 (S.D.N.Y. Mar. 29, 2010) (Gardephe, P.) ("Plaintiff cannot support her hostile work environment claim by citing acts that are gender-neutral and non-sexual in nature.").

perform her work.  *Carter v. Verizon*, 2015 U.S. Dist. LEXIS 6370, at *18-19 (S.D.N.Y. Jan. 20, 2015) (inferring age discrimination from a supervisor's comment that he needed " 'new blood' . . . would be rank speculation . . . since it could just as easily refer to bringing new members into a group, regardless of age, for a fresh perspective"); *Kirkland v. New York City Transit Auth.*, 2015 U.S. Dist. LEXIS 118308 (S.D.N.Y. Sept. 3, 2015) (same).[10]

As for Birch, the comments attributed to her (calling Plaintiffs prima donnas and stating that all these older women think that they are better than everyone else) bear no gender-based or ageist animus.  She is female and was 68 in January 2015 when she left SBH.  She was older than Khansari and Daidone and nothing about this statement suggests that her statements were derogatory: it merely reflected her perception that older Clinicians were acting as if they were better than others, including younger Clinicians.

Daidone's allegations against Quinones that he required that her notes meet minimum standards are also without merit, as he merely required that her notes meet OMH regulations, a requirement that applied to all Clinicians.  *See* 14 NYCRR § 599.10(k) (requiring that progress notes contain a summary of the service(s) provided, update of the recipient's progress toward his or her goals, and recommended changes to the elements of the recipient's TP).  She provides no proof that Quinones required this of only her.

**B.     SBH Did Not Treat Plaintiffs Differently From Similarly Situated Employees.**

The record contains no evidence that female Clinicians, who were the majority in the AOC, were treated differently.  To the extent that Plaintiffs argue that SBH singled out older

---

[10] *See also Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 65 (2d Cir. 2003) (where decisionmaker's remark or conduct is facially neutral, the court should not infer discriminatory intent, because "[c]hoosing one explanation over another without more evidence is a matter of speculation").

females for discipline, the record belies this contention.  Withim treated younger and male employees (*e.g.,* Marcano and Steele) the same way: she required them to complete their TPs and notes on time, and counseled and disciplined them when they did not. *See Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 259-60 (E.D.N.Y. 2012) (holding that a plaintiff "ha[d] not shown that white teachers who were thought to be underperforming were treated more favorably" because the defendant established that white teachers who were underperforming had also been disciplined).  Further, Daidone was not written up since EMR was implemented. *See Guzman v. City of New York*, 93 F. Supp. 3d 248, 259-60 (S.D.N.Y. 2015) (holding that evidence that a member of the plaintiff's protected class received favorable treatment undermined any inference that the defendants were motivated by discriminatory animus).

Plaintiffs' argument that Withim required them to sign off on their progress notes whereas Morales did not have his supervisor sign off on his notes does not show different treatment.  Withim did not supervise Morales, and thus Plaintiffs and Morales are not similarly situated. *Murray v. Visiting Nurse Services of N.Y.*, 528 F. Supp. 2d 257, 274 n.12 (S.D.N.Y. 2007) (holding that employees who reported to a different supervisor were not similarly situated).  Further, DeGeorge was not an LCSW and, thus, was not similarly situated to Morales, who was an LCSW.  Finally, Withim had discretion to require approval, and she required both male and female LCSWs that she supervised to have her approval on notes.  Thus, requiring Khansari to have Withim sign her notes was not discriminatory.

Plaintiffs also allege that they were treated less favorably because Morales had all his vacations approved while theirs were not.  But Plaintiffs presented no evidence of a day when Morales was granted a day off when they were not, or evidence of the needs of SBH on that day.  Thus, they cannot show that similarly situated employees were treated differently. *See Guzman,*

-25-

93 F. Supp. 3d at 260 (plaintiff failed to "raise any inference of discrimination" because she offered no evidence that the male employee was granted " 'the same day off that she was denied'" or "the needs of the [employer] ... on the day this male officer was granted the day off as compared to the day [her request] was denied"). Khansari's allegation that "other colleagues" were treated more professionally for being late cannot support her claim because she does not allege that male and younger colleagues were treated differently.

Finally, Daidone has not shown that younger and male employees (Santana, Morales and Marcano) had less rigorous caseloads. Santana was a new employee who started in September 2014. (Withim Dep. 331:6-10). Her caseload was built up gradually so as not to overwhelm her, per standard practice. (Withim Dep. 331:11 to 332:15, Khansari Dep. 275:4-12). She was also behind on her TPs, which she was informed of, and she caught up. (Withim Dep. 334:5-11). By February 2015, Santana had a larger caseload than Daidone and, by April 2015, her case load exceeded both DeGeorge's and Khansari's. (DiGia Decl. Ex. 40; Withim Dep. 287:6-15).

As for Morales and Marcano, their caseload between January and May 2015 fluctuated around 80, which was comparable to DeGeorge's and Khansari's numbers. (*Id.*). Their caseload was also higher than Daidone's in February 2015. (*Id.*). Marcano's caseload in December 2014 was also higher than DeGeorge's and Khansari's. (DiGia Decl. Ex. 21). This is not in itself significant, as caseloads can fluctuate for different reasons (*i.e.*, because cold cases are not closed). (Withim Dep. 288:14 to 289:2). What matters is performance, and Morales and Marcano consistently saw more patients every month between September 2014 and May 2015:

|          | Sept '14 | Oct '14 | Nov '14 | Dec '14 | Jan '15 | Feb '15 | Mar '15 | April '15 | May '15 |
|----------|----------|---------|---------|---------|---------|---------|---------|-----------|---------|
| Daidone  | 140      | 119     | 143     | 119     | 118     | 108     | 112     | 139       | 50      |
| Morales  | 147      | 134     | 137     | 155     | 149     | 162     | 147     | 216       | 156     |
| Marcano  | 205      | 203     | 140     | 166     | 169     | 163     | 156     | 181       | 155     |

(Withim Decl. Ex. 12).  Younger and male employees did not have less rigorous caseloads.

**C.      DeGeorge's Disability Discrimination Claim Is Without Merit.**

As for DeGeorge's disability discrimination claim, she has not identified any conduct showing that she was treated differently because of her alleged disability.   SBH granted her accommodation request in 2013.   SBH likewise attempted to accommodate her 2015 request and engaged DeGeorge in the interactive process, which was still ongoing in May, while SBH awaited a form from DeGeorge's doctor.   SBH did not fail to accommodate DeGeorge.   For these reasons, Defendant should be granted summary judgment on Plaintiffs' hostile work environment claims (asserted as the First, Second, and Fourth Causes of Actions).

**POINT III:  PLAINTIFFS ARE EXEMPT EMPLOYEES UNDER THE NYLL.
THEY ARE NOT ENTITLED TO OVERTIME UNDER THE NYLL**

Section 142-2.2 of the Minimum Wage Order for Miscellaneous Industries and Occupations provides that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of Sections 7 and 13 of 29 U.S.C. § 201 *et seq.*, the Fair Labor Standards Act of 1938, as amended, . . . ." 12 NYCRR § 142-2.2. excludes from the definition of "employee" those individuals:

> (a) whose primary duty consists of the performance of work: requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual or physical processes; . . . and

> (b) whose work requires the consistent exercise of discretion and judgment in its performance;  . . .

12 NYCRR § 142-2.14(c)(4)(iii).   This "bona fide professional" exemption does not contain a salary basis or salary level requirement.   12 NYCRR § 142-2.14(c)(4)(iii).   Plaintiffs fit within this exemption.

-27-

Plaintiffs were employed by SBH as Clinicians.   SBH required that they have the following educational qualifications: "MSW [Master in Social Work], LMSW [Licensed Master Social Worker] or LMSW eligible, Ph.D. in psychology with current license or current New York State Nurse license with an MS in psychiatric nursing required." (DiGia Decl. Exs. 5, 24, 28, 29, 30, 41; Daidone Dep. 55:3-6). To be licensed as a LMSW an individual must "have received an education, including a master's of social work degree from a program registered by the department, or determined by the department to be the substantial equivalent, in accordance with the commissioner's regulations." N.Y. Educ. Law § 7704(1)(b). *See also* NYSED LMSW License Requirements at *www.op.nysed.gov/prof/sw/lmsw.htm*, as visited on September 15, 2016 ("To meet the professional education requirement for licensure as an LMSW, you must present satisfactory evidence of having received a Master's Degree in Social Work (M.S.W.), or its equivalent, . . . ." )[11]  Thus, as relevant here, SBH required that plaintiffs hold, at a minimum, a Master's Degree in Social Work.  And they each did.  (SAC, ¶¶ 20, 22, 23; Daidone Dep. 55:3-6; DiGia Decl. Exs. 42-44).   In addition, DeGeorge was licensed by the State of New York as a LMSW, and Khansari was licensed by the State of New York as a Licensed Master Social Worker and LCSW-R.[12] (DeGeorge Dep. 23:16-22; Khansari Dep. 25:13-19, 31:22-24, 32:4-18).

Plaintiffs' primary duty consisted of the performance of work requiring knowledge of an advanced type in a field of learning customarily acquired by a prolonged course of specialized intellectual instruction and study, and the consistent exercise of discretion and judgment.

Plaintiffs' primary duty was the treatment of patients. (Khansari Dep. 19:14-15).  They

---

[11]  NYSED LMSW License Requirements (Education Requirements) at the website *www.op.nysed.gov/prof/sw/lmsw.htm* details what it means for education to be determined to be substantially equivalent. *See also* 8 NYCRR § 52.30.

[12]  N.Y. Educ. Law § 7704(2)(b) sets forth the detailed educational requirements to be a LCSW which requires, among other things, a master's of social work degree.

provided mental health services, treatment, therapy sessions (individual and group) and assessments to patients. (Khansari Dep. 16:16-18). This included: interviewing patients and gathering, analyzing and evaluating data collected relating to the client's psychosocial problems, current mental status and functioning; assessing their progress; completing diagnostic evaluations and developing treatment plans in conjunction with the client in order to define goals, outcomes and timeframes for treatment; intervening psychotherapeutically with patients by utilizing individual, group and couple therapy modalities in order to improve the individual's level of functioning; providing crisis intervention when necessary, etc. (DiGia Decl. Exs. 5, 24, 28, 29, 30, 41; Khansari Dep. 16:18-17:6, 17:19-23, 18:19-23, 19:14-22, 116:17-24, 118:8-11; Daidone Dep. 58:2-20, 69:2-20; DeGeorge Dep. 45:20-24). In addition, as a LMSW, DeGeorge was qualified to do therapy informed by psychoanalysis. (DeGeorge Dep. 24:14-15). Plaintiffs used their professional judgment in performing these duties. (DeGeorge Dep. 96:17-19; Khansari Dep. 17:17-18:4). Plaintiffs qualify as exempt employees under the NYLL. *See, e.g., Paul v. Lenox Hill Hosp.,* 2015 U.S. Dist. LEXIS 16548, at *72 (E.D.N.Y. Jan. 15, 2016); United States Department of Labor, Wage and Hour Division, FLSA 2005-50. https://www.dol.gov/whd/opinion/FLSA/2005/-2005_11_04_50_FLSA.htm (Nov. 4, 2005) ("Social Workers with Master's Degrees who work in the field of their degree" meet the requirements for the FLSA professional exemption).[13]

### POINT IV:   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' OVERTIME CLAIMS.

Plaintiffs' overtime claims pursuant to the FLSA and NYLL (assuming they are covered

---

[13] "Because the FLSA test [for the professional exemption] is more expansive . . . a separate analysis of the state [NYLL] claims is unnecessary." *Levine v. Unity Health Sys.,* 847 F. Supp. 2d 507, 509 n.1 (W.D.N.Y. 2012).

by the NYLL) fail as a matter of law.  In order to survive summary judgment on an unpaid overtime claim under the FLSA or NYLL, a plaintiff must prove "that she performed work for which [s]he was not properly compensated."  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946); *Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 362 (2d Cir. 2011).  The plaintiff must also establish that the employer had actual or imputed knowledge that the employee was working during those uncompensated hours.  *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 287 (2d Cir. 2008); *Gordon v. Kaleida Health*, 299 F.R.D. 380, 392 (W.D.N.Y. 2014) (employer will not be liable where it has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer).

Where the employer maintains proper and accurate time records, as defendant did here, a plaintiff must prove with " 'definite and certain evidence' " that she worked overtime hours for which she did not receive overtime pay.  *McGrath v. Cent. Masonry Corp.*, 2009 U.S. Dist. LEXIS 94870, at *15 (D. Colo. Sept. 29, 2009) (citation omitted).  Where an employer has failed to maintain accurate records, an employee satisfies her burden pursuant to *Mt. Clemens* if she proves that she has performed work for which she was improperly compensated by producing sufficient evidence to show the amount and extent of that work as a matter of "just and reasonable inference."  *Kuebel*, 643 F.3d at 362 (citing *Mt. Clemens*, 328 U.S. at 687).[14]  The burden then shifts to the employer to provide evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the plaintiff's evidence.  *Mt. Clemens*, 328 U.S. at 687-88.

---

[14] *See also Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98 (S.D.N.Y. 2009) (Gardephe, J) (the court applied the *Anderson* test to claims under both the FLSA and NYLL); *McGlone v. Contract Callers, Inc.*, 49 F. Supp. 3d 364, 371 (S.D.N.Y. 2014); *Kuebel*, 643 F.3d at 357 n.1.

To satisfy this "just and reasonable standard," a plaintiff must introduce credible evidence to substantiate that she performed the overtime work alleged. *Daniels v. 1710 Realty LLC*, 2011 U.S. Dist. LEXIS 91902, at *16-17 (E.D.N.Y. Aug. 17, 2011), *aff'd*, 497 F. App'x 137 (2d Cir. 2012). While a plaintiff can meet her burden of proof where she offers evidence of detailed and credible accounts of the hours she worked during different time periods, she will not meet her burden where she fails to specifically identify the unpaid hours she allegedly worked. *Paul*, 2015 U.S. Dist. LEXIS 16548, at *72 ("[P]laintiff provides no accounting, even by deposition testimony or affidavit, of her scheduled hours, which hours she worked overtime, and the payments she failed to receive. Absent any evidence that plaintiff performed work that she was not paid for plaintiff fails to state a claim regarding the sufficiency of her wages."); *see also Keubel*, 643 F.3d at 364.

Vague or scattered evidence or testimony will not defeat summary judgment. *See Kolesnikow*, 622 F. Supp. 2d at 118-19 ("[T]he only evidence concerning the amount of extra time [plaintiff] worked each week is her testimony that she 'sometimes' worked an extra half hour when she worked through her lunch break. . . . Therefore, in the absence of evidence showing the amount of extra time . . . that she worked each week., [plaintiff's] testimony does not provide a sufficient basis to infer that she worked more than 40 hours in any given week.").[15] (citation and footnote omitted.) The evidence produced by Plaintiffs does not come close to satisfying their burden.

---

[15] *See also DiSantis v. Morgan Props. Payroll Servs.*, 2010 U.S. Dist. LEXIS 96838, at *36-37 (E.D. Pa. Sept. 16, 2010) (*even if* the Court assumed that Morgan Properties' time-records were inaccurate, DiSantis failed to produce sufficient evidence to sustain her FLSA claim because she relied solely on vague, conclusory, and speculative testimony to support her claim that she "often worked more than 40 hours in weeks of her employment from the start of her employment until the end of her employment.").

FIRM:38194012

A.      **Plaintiffs Cannot Establish They Worked More Than 40 Hours in Any Workweek**

Defendant has maintained a strict time keeping policy by which it has accurately recorded by punch clock time worked by Plaintiffs. (Khansari Dep. 40:16-41:3, 280:14-20; DeGeorge Dep. 15:12-15; Daidone Dep. 16:6-17). In addition, SBH has, since June 2013, maintained the EMR system and also has, for the relevant period of this lawsuit, telephone logs showing all telephone usage by Plaintiffs from their extensions. (Khansari Dep. 75:6-13, 76:15-17; DeGeorge Dep. 145:12-20; Daidone Dep. 32:6-12, 17-20). Because Defendant maintained proper and accurate time records, which show that they did not work more than 40 hours in a workweek, Plaintiffs are required to prove with "definite and certain evidence" that they worked overtime (*i.e.,* more than 40 hours in a workweek) for which they were not paid. *McGrath,* 2009 U.S. Dist. LEXIS 94870, at *15. As demonstrated by their deposition testimony, Plaintiffs have failed to do this. Indeed, Plaintiffs fail to present evidence that satisfies even the less rigorous *Mt. Clemens* burden of establishing through credible evidence the amount and extent of unpaid overtime work as a matter of just and reasonable inference. Instead, Plaintiffs provide only vague and sweeping testimony that they generally worked overtime before and after they clocked-in and clocked-out, respectively, as well as during their lunch breaks. None of the Plaintiffs was able to identify any specific dates or times when they allegedly worked unpaid overtime. *See, e.g.,* Khansari Dep. 216:2-10 ("I can't be as specific about the date. . . . I can't be specific about one time"), 222:21-23 ("I can't say what I did in 2013, I can't recall"), 291:22-23 (Plaintiff cannot recall a single date in 2014 where she worked over 40 hours in a work week), 297:25-298:15 ("It was regular. Myself and everybody else stayed late and worked . . . . Almost as long as I was at work, I worked late . . . As long as I was at work, my answer is the same"); DeGeorge Dep. 138:7-8 ("I don't remember what time I came in"), 139:16-23 & 140:19-23 (Plaintiff does not have any document or record indicting that she started working at a time other

-32-

than the time that she punched in or out); Daidone Dep. 128:11-15 (Plaintiff is unable to identify any week where she worked more time than shown on her time sheets), 195:9-17 (Plaintiff does not have any documents indicating that she worked before or after she clocked-in or clocked-out, respectively, or that she worked through her meal breaks).  Such imprecise evidence does not provide a sufficient basis -- under either burden -- to support Plaintiffs' unpaid overtime claim.

Further undermining their claims, Plaintiffs cannot specifically describe the work they performed when they allegedly worked unpaid overtime hours on any particular day. *See* Khansari Dep. 248:6-17 ("I can't recall that day what I did"); DeGeorge Dep. 145:21-146:3 (Plaintiff does not recall any specific work she performed after she punched-out of work); Daidone Dep. 34:2-23 (Plaintiff refers generally to "paperwork," but is unable to articulate what that means or to what it refers.  Plaintiff admits that "paperwork" did not encompass her work with medical records or telephone calls).  Plaintiffs cannot substantiate their unpaid overtime claim where they have failed to articulate the duties they performed while allegedly working unpaid overtime.

**B.**     **Plaintiffs Cannot Establish Defendant Was Aware They Worked "Off The Clock"**

To the extent Plaintiffs worked any off-the-clock overtime hours -- which they are unable to sufficiently prove -- Defendant did not have actual or imputed knowledge of that.

First, Plaintiffs never received permission to work overtime and understood that they were not approved to do so. *See* Khansari Dep. 50:24-52:2, 52:6-14, 147:25-148:8 (Khansari never requested overtime), 281:14-21 (pursuant to SBH policy, overtime must be requested and authorized); DeGeorge Dep. 137:21-23 (DeGeorge knew that overtime had to be approved in advance); Daidone Dep. 127:25-128:3 (Daidone testified that she was not authorized to work overtime), 149:16-19 (Daidone testified that she worked overtime even though she was told not to), 192:2-3, 8-10 (Daidone never requested overtime and admitted that the allegation in her

-33-

complaint that she was denied requested overtime was not true).

Second, Plaintiffs' supervisors were not aware of their alleged off-the-clock work. *See* Khansari Dep. 143:11-22 (Plaintiff did not tell her supervisor that she performed work after clocking-out), 195:17-196:4 (No one told Plaintiff to clock-out and then perform additional off-the-clock work), 196:16-19 (No one instructed Plaintiff to perform work before clocking-in), 197:14-17 (No one directed Plaintiff to work through breaks without getting paid); DeGeorge Dep. 159:9-20 (Plaintiff did not complain to Human Resources, the Program Director, or her supervisor that she worked time for which she was not paid); Daidone Dep. 21:14-16 (Plaintiff's supervisor told her to always truthfully record her time), 53:16-19 (Plaintiff did not complain to SBH prior to this lawsuit that she was not paid for working overtime), 107:2-6 (Plaintiff was told by SBH that she and Plaintiffs Khansari and DeGeorge were not permitted to arrive at work before the designated start of their shifts), 128:4-6 (Plaintiff was not instructed by any supervisor to work off-the-clock), 144:22-25 (Plaintiff never told a supervisor that she performed work off-the-clock), 145:2-20 (Birch told Plaintiff to clock-out on time and go home). To the contrary, SBH made it clear that Clinicians were not to come to work early. (Daidone Dep. 105:21-24). Indeed, SBH instructed Plaintiffs that they were not to come in before the start of their shifts. (Daidone Dep. 107:2-6). Moreover, no one in SBH management ever told Khansari to clock out and then go back to work. (Khansari Dep. 194:25-195:6, 195:14-24, 195:25-196:4). Nor was she ever told that she should do work before clocking in or to work through lunch. (Khansari Dep. 196:16-22, 197:5-10).[16]

---

[16] Plaintiffs testified that they did not falsify their time records. (Khansari Dep. 192:19-22; Daidone Dep. 27:2-4; DeGeorge 279:2-8). To the extent they are now claiming that they did and they knowingly submitted false time entries, they are not entitled to recover for the alleged unpaid overtime hours worked. *See, e.g., Kuebel*, 634 F.3d at 363; *Forrester v. Roth's I.G.A.*

Accordingly, even if Plaintiffs had worked off-the-clock overtime hours (which they did not), Defendant is not liable for compensating them for such time because they had no knowledge of it. *Gotham Registry, Inc.*, 514 F.3d at 287; *Gordon*, 299 F.R.D. at 392. Defendant should be granted summary judgment on Plaintiffs' FLSA and NYLL claims.

## POINT V:  DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' WTPA CLAIMS.

Plaintiffs' seventh cause of action alleges a violation of the NYLL Wage Theft Prevention Act.  (DE 17, ¶¶ 167-169).  Plaintiffs do not specify how their paystubs failed to comply with the WTPA and, in fact, those paystubs did comply with the WTPA. (DiGia Decl. Exs. 45, 46).  To the extent Plaintiffs assert that their paystubs were inaccurate because they did not reflect overtime hours allegedly worked, Defendant should be granted summary judgment. As discussed above, Plaintiffs are exempt under the NYLL and otherwise have not demonstrated that they worked any hours for which they were not paid.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the SAC be dismissed in its entirety with prejudice and that summary judgment be granted in its favor, together with costs and disbursements.

New York, New York
September 19, 2016

EPSTEIN BECKER & GREEN, P.C.

By: /s James S. Frank
    James S. Frank
    250 Park Avenue
    New York, NY  10177
    Telephone:  (212) 351-3762
    *Attorneys for Defendant St. Barnabas Hospital*

---

*Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981) (where an employee "deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of [the FLSA].").

FIRM:38194012

## CERTIFICATE OF SERVICE

I, Owen G. Wallace, an attorney admitted to practice before this court, hereby certify, under penalty of perjury, that on September 19, 2016, I caused a true copy of the attached Defendant's Memorandum of Law in Support of its Motion for Summary Judgment to be served by hand delivery upon:

Timothy Staines, Esq.
Hach, Rose, Schirripa & Cheverie LLP
185 Madison Avenue, 14th Floor
New York, NY   10016

Attorneys for Plaintiffs

September 21, 2016

Owen G. Wallace