UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MARYAM KHANSARI, IBY DEGEORGE-GEAREY and
MARIA DAIDONE, on behalf of themselves and all others
similarly situated,

                         Plaintiffs,

              – against –

ST. BARNABAS HOSPITAL,


                       Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ECF Case

15-CV-1803 (PGG) (HBP)


# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR DECERTIFICATION


EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177
(212) 351-4500

*Attorneys for Defendant St. Barnabas Hospital*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 2

ARGUMENT .............................................................................................................................. 9

POINT I    LEGAL STANDARD ON A MOTION TO DECERTIFY ....................................... 9

POINT II   THE NAMED PLAINTIFFS FORGED PATIENT
           SIGNATURES. THEY ARE SUBJECT TO UNIQUE DEFENSES ...................... 10

POINT III  THE OPT-IN PLAINTIFFS' DEPOSITION TESTIMONY
           DEMONSTRATES THAT THEY ARE NOT SIMILARLY
           SITUATED TO THE NAMED PLAINTIFFS ...................................................... 12

    A.   The Disparate Circumstances of Each Plaintiff's
         Employment  Circumstances Warrant Decertification ...................................... 12

    B.   The Opt-in Plaintiffs' Differences Show That Defendant Has
         Individualized Defenses With Respect to Each Plaintiff and Claim ................ 16

    C.   Fairness and Procedural Considerations
         Counsel Against Collective-Action Treatment .................................................. 24

CONCLUSION .......................................................................................................................... 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Albrecht v. Wackenhut Corp.*,
  No. 07-cv-06162, 2009 U.S. Dist. LEXIS 88073
  (W.D.N.Y. Sept. 24, 2009) ..............................................................................................20

*Allen v. Bd. of Pub. Educ. for Bibb Cnty.*,
  495 F.3d 1306 (11th Cir. 2007) .......................................................................................18

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680 (1946) .........................................................................................................20

*Brumbelow v. Quality Mills, Inc.*,
  462 F.2d 1324 (5th Cir. 1972) .........................................................................................18

*Chao v. Gotham Registry, Inc.*,
  514 F.3d 280 (2d Cir. 2008) .............................................................................................17

*Charvac v. M & T Project Managers of N.Y., Inc.*,
  No. 12-cv-05637, 2015 U.S. Dist. LEXIS 124906
  (E.D.N.Y. June 17, 2015) .................................................................................................23

*Clauson v. Eslinger*,
  455 F. Supp. 2d 256 (S.D.N.Y. 2006) ..............................................................................11

*D'Arpa v. Runway Towing Corp.*,
  No. 12-cv-1120, 2013 U.S. Dist. LEXIS 85697
  (E.D.N.Y. June 18, 2013) .................................................................................................24

*Daniels v. 1710 Realty LLC*,
  No. 10-cv-00022, 2011 U.S. Dist. LEXIS 91902
  (E.D.N.Y. Aug. 17, 2011), *aff'd*, 497 F. App'x 137 (2d Cir. 2012) ..........................21

*Diaz v. S&H Bondi's Dep't Store, Inc.*,
  No. 10-cv-7676, 2012 U.S. Dist. LEXIS 5683
  (S.D.N.Y. Jan. 17, 2012) ............................................................................................22, 23

*Gordon v. Kaleida Health*,
  299 F.R.D. 380 (W.D.N.Y. 2014) .....................................................................................17

*Hernandez v. Fresh Diet, Inc.*,
  No. 12-cv-4339, 2014 U.S. Dist. LEXIS 139069
  (S.D.N.Y. Sept. 29, 2014) .................................................................................................10

*Hinojos v. Home Depot, Inc.,*
No. 06-cv-00108, 2006 U.S. Dist. LEXIS 95434
(D. Nev. Dec. 1, 2006) ............................................................................................................24

*Hinterberger v. Catholic Health Sys.,*
299 F.R.D. 22 (W.D.N.Y. 2014) ......................................................................................12, 20

*Jacob v. Duane Reade, Inc.,*
No. 11 Civ. 0160, 2016 U.S. Dist. LEXIS 75384
(S.D.N.Y. June 9, 2016) ..........................................................................................................10

*Joza v. WW JFK LLC,*
No. 07-cv-04153, 2010 U.S. Dist. LEXIS 94419
(E.D.N.Y. Sept. 9, 2010) ..........................................................................................18, 19, 20

*Kellar v. Summit Seating Inc.,*
664 F.3d 169 (7th Cir. 2011) ..................................................................................................18

*Lee v. ABC Carpet & Home,*
236 F.R.D. 193 (S.D.N.Y. 2006) ......................................................................................10, 23

*Lynch v. City of New York,*
No. 16-cv-5677, 2017 U.S. Dist. LEXIS 178855
(S.D.N.Y. Oct. 27, 2017) ..........................................................................................9, 16, 24, 25

*Malena v. Victoria's Secret Direct, LLC,*
No. 09-cv-5849, 2010 U.S. Dist. LEXIS 121320
(S.D.N.Y. Nov. 16, 2010) ........................................................................................................23

*Melgadejo v. S&D Fruits & Vegetables Inc.,*
No. 12-cv-6852, 2013 U.S. Dist. LEXIS 159932
(S.D.N.Y. Nov. 7, 2013) ..........................................................................................................23

*Mota v. Imperial Parking Sys.,*
No. 08-cv-9526, 2010 U.S. Dist. LEXIS 87593
(S.D.N.Y. Aug. 24, 2010) ........................................................................................................11

*Myers v. Hertz Corp.,*
624 F.3d 537 (2d Cir. 2010) ......................................................................................................9

*Newton v. City of Henderson,*
47 F.3d 746 (5th Cir. 1995) ................................................................................................18, 19

*Parada v. Banco Indus. de Venez.,*
753 F.3d 62 (2d Cir. 2014) ......................................................................................................22

iv

*Paul v. Lenox Hill Hosp.,*
    No. 13-cv-01566, 2016 U.S. Dist. LEXIS 16548
    (E.D.N.Y. Jan. 15, 2016) ........................................................................................................21

*Rodriguez v. Obam Mgmt.,*
    No. 13-cv-00463 (PGG) (DF), 2016 U.S. Dist. LEXIS 155315
    (S.D.N.Y. Nov. 7, 2016) ........................................................................................................23

*Ruggles v. WellPoint, Inc.,*
    591 F. Supp. 2d 150 (N.D.N.Y. 2008) ..................................................................................10

*Ruiz v. Citibank, N.A.,*
    93 F. Supp. 3d 279 (S.D.N.Y. 2015),
    *aff'd*, 687 F. App'x 39 (2d Cir. 2017) ..................................................................................12

*Scott v. Chipotle Mexican Grill, Inc.,*
    No. 12-cv-8333, 2017 U.S. Dist. LEXIS 62902
    (S.D.N.Y. Mar. 29, 2017) .....................................................................................................10

*Seward v. IBM Corp.,*
    No. 08-cv-03976, 2012 U.S. Dist. LEXIS 38523
    (S.D.N.Y. Mar. 9, 2012) .................................................................................................12, 17

*Soderberg v. Naturescape, Inc.,*
    Civ. No. 10-3429, 2011 U.S. Dist. LEXIS 156235
    (D. Minn. Nov. 3, 2011) ........................................................................................................11

*Thind v. Healthfirst Mgmt. Servs., LLC,*
    No. 14-cv-9539, 2016 U.S. Dist. LEXIS 170503
    (S.D.N.Y. Dec. 9, 2016)...............................................................................................9, 13, 16

*White v. Baptist Mem'l Health Care Corp.,*
    699 F.3d 869 (6th Cir. 2012) ...............................................................................................20

*Zavala v. Wal-Mart Stores Inc.,*
    691 F.3d 527 (3d Cir. 2012)..................................................................................................10

*Zivali v. AT & T Mobility, LLC,*
    784 F. Supp. 2d 456 (S.D.N.Y. 2011)...........................................................................*passim*

**Statutes**

29 U.S.C. § 216............................................................................................................................23

29 U.S.C. § 255......................................................................................................................22, 23

29 U.S.C. § 256............................................................................................................................23

## PRELIMINARY STATEMENT

Defendant St. Barnabas Hospital (the "Hospital"), by its attorneys, Epstein Becker & Green, P.C., respectfully submits this memorandum of law in support of its motion to decertify Plaintiffs' conditionally certified Fair Labor Standards Act ("FLSA") collective action.

This Court should decertify the collective action – comprised of current and former employees who primarily worked as Clinicians within the Hospital's Fordham-Tremont Community Mental Health Center ("FTCMHC") – because the undisputed evidence establishes that the individuals who opted in to that collective action are not similarly situated to the named Plaintiffs. The named Plaintiffs allege in their Second Amended Complaint that their requests for overtime approval were routinely denied and that, despite being denied overtime approval, they were specifically told by their supervisors to work overtime in excess of their regular workweek but not to "clock in" or to "clock out" while working. The named Plaintiffs obtained conditional certification of the collective action based on their representations that the Hospital subjected all Clinicians to this unlawful policy of *directing* them to work off-the-clock.

This has now been proven false. The Court should decertify the collective action because the opt-in Plaintiffs' admissions demonstrate that the unlawful *de facto* policy alleged in the Second Amended Complaint, and on which the Court granted conditional collective action certification, did not exist. The named Plaintiffs' and the opt-in Plaintiffs' disparate factual and employment settings confirm that there is no common basis on which to adjudicate their claims or the defenses thereto: (1) virtually every opt-in plaintiff who was deposed testified that they were never told to work off the clock; (ii) many opt-in Plaintiffs testified that, contrary to Hospital policy, they never requested approval to work overtime; and (iii) a number of opt-in plaintiffs testified that they were affirmatively told *not* to work off-the-clock. Thus, the named

Plaintiffs' experiences were unique to themselves and markedly different from Clinicians in other clinics.

## STATEMENT OF FACTS

### A.   Procedural history

Plaintiffs' filed their Second Amended Complaint on July 6, 2015 (the "SAC") [DE 18] on behalf of all FTCMHC Clinicians employed by the Hospital since March 11, 2009.  On May 12, 2016, the Court conditionally certified the collective action requested by Plaintiffs and granted Plaintiffs leave to disseminate notice of the lawsuit.  [DE 60.]

Following issuance of the Court's May 2016 Order, Plaintiffs sent notice to approximately 150 current and former employees.   Thereafter, 52 individuals joined the collective action. [DEs 76-81, 84.]  However, 37 opt-in Plaintiffs remain; 15 have withdrawn from the action.[1] [DE 117.]  Counting the three named Plaintiffs there are now a total of 40 Plaintiffs in this action.

At an October 17, 2017 conference, Judge Pitman struck the discovery requests that Defendant had already served on the opt-in Plaintiffs, limited Defendant to 20 depositions of the opt-in Plaintiffs, and rejected Defendant's request to serve interrogatories on the opt-ins who

---

[1] The 37 individuals who opted in to this action come from a variety of FTCMHC clinical programs. For example, approximately: eight are from the Adult Outpatient Clinic; seven are from the Continuing Care Clinic; six provided school based family services through one of two clinical programs; five are from the David Casella Children's Services Clinic; three are from Centralized Intake; one is from Fordham Tremont South; one is from Family Crisis Services/Crime Victims Assistance Clinic; and two are not Clinicians, but rather are Social Workers. (*See* ¶ 3 of DE 121 (Declaration of Kenneth W. DiGia in Support of Defendant's Objections to Portions of the Orders Issued by Magistrate Judge Henry B. Pitman on October 17, 2017, dated October 31, 2017).)

would not be deposed[2] [DE 109].  Pursuant to that Order, Defendant deposed 19 opt-in plaintiffs

(although it had requested to depose all of the opt-ins) between November 6, 2017 and December

4, 2017.[3]  These depositions show the wide disparity of experiences of the opt-in Plaintiffs thus

proving they are not similarly situated to the named Plaintiffs.

**B.     Plaintiffs Do Not Challenge the Hospital's Written Policy**

Plaintiffs acknowledge that the Hospital has a written policy regarding overtime that

complies with the FLSA.  In their Second Amended Complaint, Plaintiffs allege that:

> [St. Barnabas] discourages overtime work out of consideration for the needs of
> employees to have sufficient relief and rest. Because of the around-the-clock
> nature of the facility, it may occasionally be necessary for employees to work
> some overtime. Employees who are eligible for overtime under the Fair Labor
> Standards Act will be paid one and half times their regular rate for time worked in
> excess of their normal full-time work-week.
>
> Overtime must be requested and authorized by the appropriate Department Head
> and Administration. Employees will be expected to work the hours assigned and
> should not report for work more than fifteen (15) minutes before the time
> assigned and will be expected to leave their work areas no later than fifteen (15)
> minutes after the completion of their work shift. Five (5) minutes or less worked
> before or after an employee's regular shift shall not be counted for overtime
> purposes.
>
> Employees will be required to work overtime where patient care is of primary
> concern.

[DE 18, ¶ 95 (quoting Employee Handbook, p. 6).][4]  The named Plaintiffs admit that they were

instructed that if overtime work was necessary, the Hospital's policy was that overtime must be

---

[2]  At the time Judge Pitman issued his Orders, both Judge Pitman and Defendant believed there
were 52 opt-in Plaintiffs.  Only Plaintiffs' counsel was aware at the October 17 conference that
some number of opt-ins would soon be voluntarily dismissed from the action.

[3] Defendant took 20 depositions.  One person who was deposed, Betty Barsa, was not an opt-in
Plaintiff at the time of her deposition.  Defendant's Objections to the 20 deposition limitation are
pending before the Court [DE 120]. Defendant believes that depositions of the remaining opt-in
Plaintiffs will further demonstrate the propriety of decertification.

[4] The SAC alleges that the named Plaintiffs' workday is 7 hours (excluding mealtime) and that
the Hospital's Employee Handbook provides that "'non-management employees receive two

requested and approved by the Clinician's supervisor.  (Ex. A (Khansari Dep.) 51:5-52:14,

255:7-16, 281:14-282:8; Ex. B (Daidone Dep.) 127:25-128:3; Ex. C (DeGeorge-Gearey

Dep.) 137:17-23; DE 18, ¶ 14; DE 28, p. 10.)[5]

**C.     Plaintiffs Obtained Conditional Certification Based
on an Alleged De Facto Policy That They Were
Directed to Work Off-the-Clock**

Given Plaintiffs' acknowledgement of the Hospital's FLSA-compliant written policies,

the Court conditionally certified the collective action based on Plaintiffs' representations of the

existence of a *de facto* policy in which Plaintiffs were directed to work overtime without

compensation [DE 60].

**(1)     Plaintiffs Allege In Their Second Amended Complaint
That They Were Directed to Work Off-the-Clock**

Plaintiffs allege "[t]he Named Plaintiffs' and the putative class members' requests for

overtime approval have been routinely denied."  [DE 18, ¶ 97.]  The SAC alleges further that

despite being denied overtime approval, the "Named Plaintiffs and the putative class are expected,

and, in fact, have been *told by [their] supervisors to work overtime in excess of their regular work

week* but not to 'clock in' and record their hours such that they would be compensated for working

overtime."  [DE 18, ¶ 98 (emphasis added); *see also* DE 18, ¶ 47 ("St. Barnabas approved two

male clinicians, who have been far less diligent in their employment duties, to work and receive

overtime compensation-in the face of a unwritten company-wide directive to deny overtime

requests while demanding that non-exempt employees 'clock out' and stay late to complete their

---

fifteen minute rest periods during each full workday as assigned by the Supervisor....'" [DE 18,
¶ 93.]  The SAC further alleges that employees are required to enter their daily time, every day,
by "clocking in" and "clocking out" through the ADP E-Time system, and that the Employee
Handbook instructs employees not to swipe in more than a few minutes before their shift begins
or swipe out more than a few minutes after their shift ends.  [DE 18, ¶ 94.]

[5] All exhibits referenced herein are to the accompanying Declaration of Kenneth DiGia in
Support of Defendant's Motion for Decertification, dated December 11, 2017.

daily tasks.")] The SAC goes on to allege that former Adult Outpatient Clinic Director Judith Birch confirmed this "policy" in a weekly Clinician staff meeting stating " 'You have to clock out on time, but what you do afterward is none of my business.' " [DE 18, ¶ 101.] The SAC further alleges that "[d]espite being *denied* overtime approval, the Named Plaintiffs' and the putative class members' workloads have been increased, and they are expected to finish their workload 'off-the-clock.'" [DE 18, ¶ 102 (emphasis added).]

(2)   **Plaintiffs Declarations In Support of Their Motion for Conditional Certification Asserted That There Was a De Facto Policy Directing Clinicians to Work Off-the-Clock Work**

Plaintiffs' motion for conditional certification dated September 25, 2015 [DE 28][6] was supported by declarations submitted by named Plaintiffs Maryam Khansari, Iby DeGeorge-Gearey and Maria Daidone; as well as declarations by Maria Kumagay and Betty Barsa.[7] Khansari, DeGeorge-Geary, Daidone and Kumagay are former Clinicians who worked in the Adult Outpatient Clinic, one of seven FTCMHC Ambulatory Care Facility sub-units operated by the Hospital, from 2009 up until the date of their termination.[8] [DE 28, p 9.] Barsa worked as a Clinician for a few months and then as a Supervisor all from April 2011 to May 2014; Plaintiffs contended that she had "personal knowledge of the unlawful compensation practices imposed upon Plaintiffs and other Clinicians" at the Hospital. [DE 28, p 9.]

---

[6] The page citations herein to DE 28 and DE 60 refer to the page numbers designated by this District's Electronic Case Filing System. For the sake of brevity, citations to the declarations within DE 28 are omitted.

[7] Kumagay was a named Plaintiff, but her claims were dismissed by this Court without prejudice on May 12, 2016. [DE 64, pp. 4:20-9:14]. She then opted-in to the Action on October 18, 2016 [DE 80].

[8] Khansari, DeGeorge-Gearey and Daidone were terminated by the Hospital on May 15, 2015. [DE 28, p. 9.] Kumagay was terminated by the Hospital on July 5, 2016. (Ex. D (Kumagay Dep.) 46:22-24.)

Plaintiffs' conditional certification motion argued that "Clinicians consistently work more than 40 hours a week to complete their necessary daily tasks, however, their requests for overtime approval are routinely denied by their supervisors." [DE 28, p. 10.] Further, the motion contended that "[d]espite being denied overtime approval, Clinicians are expected to work uncompensated overtime hours to finish their work 'off-the-clock,'" which included work on weekends, through lunch and rest periods, and prior to "clocking in" and after "clocking out." [DE 28, p. 10.] The Motion succinctly identified the alleged *de facto* policy: "Clinicians are *instructed* to finish their workloads 'off-the-clock,' in order to avoid reprimand and discipline for 'underperformance.'" [DE 28, p. 10 (emphasis added).]

According to Plaintiffs, the Hospital's "policies and practices regarding uncompensated overtime work does not vary from Clinician to Clinician, and applies to the entire staff of Clinicians uniformly." [DE 28, pp. 10-11.] Citing to Barsa's declaration (DE 29-5 ¶¶ 29, 32-33), Plaintiffs contend that "St. Barnabas is aware that their Clinicians working at each St. Barnabas location regularly works 'off-the-clock' to finish their workloads even though they are being denied overtime approval." [DE 28, p. 11.] Further, again citing Barsa's declaration (DE 29-5 ¶¶ 30-31), the Motion claimed that Adult Outpatient Clinic Director Judith Birch stated, during Clinician staff and Supervisor meetings (and in e-mail correspondence) "that all Clinicians were required to work in the evening, on the weekends, or both." [DE 28, p. 11.]

In granting Plaintiffs' motion for conditional certification, the Court accepted Plaintiffs' allegations as "sufficient at this stage to demonstrate that the named Plaintiffs and potential opt-in plaintiffs were victims of a common St. Barnabas policy." [DE 60, p. 11.] Although not stated by the Court, the "common policy" allegedly affecting all Clinicians was the unwritten directive that they work off-the-clock without having "clocked in" or after they "clocked out."

6

### (3)   Betty Barsa Testified That There Was a De Facto Policy Requiring Off-the-Clock Work But Admits That Her Knowledge is Limited to the Adult Outpatient Clinic

At her deposition Barsa corroborated her declaration in which she said that there was a *de facto* policy in which the Clinicians' request to work overtime would be denied but that they were required to work overtime [DE 29-5]. Specifically, she testified that Judy Birch explicitly told clinicians to perform off-the-clock work. (Ex. E (Barsa Dep.) 87:10-91:23; *see also* Barsa Decl. [DE 29-5], ¶ 26 ("Judith Birch, would tell the Clinicians to finish their workloads 'off-the-clock'".) Significantly, however, she testified that her assertion in paragraph 33 of her declaration, that "'kn[e]w there are many other former and current St. Barnabas Clinicians who have been treated similarly with respect to unpaid overtime hours,'" was referring *only* to those clinicians who she (Barsa) personally supervised in the Adult Outpatient Clinic. (Ex. E 179:7-20.) In other words, that statement and Barsa's knowledge of the purported *de facto* policy (on which the Court relied in granting Plaintiffs' motion for conditional collective action certification) referred only to the Clinicians Barsa supervised within the Adult Outpatient Clinic.[9] Barsa left the Hospital and the Adult Outpatient Clinic in May 2014. [DE 29-5, ¶ 5.]

### D.   Opt-In Discovery Demonstrates That the Opt-In Plaintiffs Are Not Similarly Situated to the Named Plaintiffs

The opt-in Plaintiffs' depositions have demonstrated they are not similarly situated to the named Plaintiffs.

First, the three named Plaintiffs (and Kumagay) were fired for forging patient signatures on Treatment Plans, fraudulent and illegal conduct. The Court granted Defendant summary

---

[9] Barsa also distanced herself from other statements in her declaration. When asked what she meant by "seeking overtime approval" in paragraph 22 of her declaration, Barsa testified that she had no recollection of the sworn statement. (Ex. E 127:17-128:7.) She also could not recall making the statement in her declaration that "[a]ccording to St. Barnabas's policy, all overtime had to be requested and authorized by the appropriate supervisor." (Ex. E 128:8-20.)

judgment on this issue. [DE 102, pp. 27-35, 69-72.] Thus, they are entirely different from any of the opt-in Plaintiffs and will be subject to unique defenses and arguments. It is inappropriate that they act as representatives of any opt-in Plaintiffs.

Second, virtually every one of the opt-in Plaintiffs testified that they were never directed to work off the clock as the named Plaintiffs claimed. Indeed, of the 19 opt-in Plaintiffs deposed, only one testified that they received such an instruction and that opt-in Plaintiff was Larry Stone who likewise worked in the Adult Outpatient Clinic.[10] Indeed, several Clinicians were specifically instructed *not* to work off the clock. At least one Clinician testified that shortly after this lawsuit was filed they were not even allowed to be in the building before or after their scheduled start and end times.

Third, Defendant has different defenses to each opt-in Plaintiffs' claims. For example, some Plaintiffs were not able to recall the amount of overtime they allegedly worked as a matter of "just and reasonable inference." Others testified that they affirmatively sought to conceal from their supervisors that they were working off-the-clock. Those that did not try to conceal this testified that the only way their supervisors would know about their alleged off-the-clock work was because they were seen in their office; however, at least one opt-in Plaintiff remained after clocking-out to attend to personal matters.

Under these circumstances, there is no way, consistent with Due Process, to adjudicate the claims of all Plaintiffs and all opt-in Plaintiffs based on "representative testimony." Indeed, to determine whether any Plaintiff or opt-in Plaintiff can establish a claim and the Hospital's defenses thereto could only be determined by taking testimony and evidence from each Plaintiff

---

[10] Stone testified that she was given this instruction by Alma Withim who was her supervisor in the Adult Outpatient Clinic. (Ex. F (Stone Dep.) 33:25-34:9; 166:12-167:19.)

and opt-in Plaintiff and affording the Hospital the opportunity to contest each person's claims and present defenses specific to them.

**ARGUMENT**

**POINT I**

**LEGAL STANDARD ON A MOTION TO DECERTIFY**

The Second Circuit has endorsed a "two-step method" for determining whether to certify an FLSA collective action. *See Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010). At the first step, which in this Action occurred in May 2016 [DE 60], the Court made "an initial determination to send notice to potential opt-in plaintiffs who may be similarly situated to the named Plaintiffs with respect to whether a FLSA violation has occurred." *Id.* (citations and internal quotation marks omitted). The second step however requires the court to review a fuller record, and determine "whether the plaintiffs who have opted in are in fact similarly situated to the named Plaintiffs." *See id.* (internal quotation marks omitted).

The analysis required at this second stage is stricter than at the first stage, because the record permits the Court to make a more informed decision as to whether the collective group is in fact "'similarly situated.'" *Myers*, 624 F.3d at 555; *Lynch v. City of New York*, No. 16-cv-5677, 2017 U.S. Dist. LEXIS 178855, at *7 (S.D.N.Y. Oct. 27, 2017) ("The Court must apply a more 'stringent standard' of proof in this second stage for determining whether plaintiffs are similarly situated for the purposes of the FLSA.") (citation omitted); *see also* DE 60, p. 7 ("After discovery, courts typically engage in a 'second tier' of analysis to determine on a full record – and under a more stringent standard – whether the additional plaintiffs are similarly situated."). This stringent standard requires that a plaintiff demonstrate by a "preponderance of the evidence" that the opt-in plaintiffs are similarly situated. *Thind v. Healthfirst Mgmt. Servs., LLC*, No. 14-cv-9539, 2016 U.S. Dist. LEXIS 170503, *5-6 (S.D.N.Y. Dec. 9, 2016); *see also Lynch*,

2017 U.S. Dist. LEXIS 178855, at \*7 ("The burden is on the plaintiffs to prove that all class members are similarly situated.") (citation omitted); *Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 534 (3d Cir. 2012) (articulating "preponderance of the evidence" standard).

Courts evaluating whether the opt-in plaintiffs are "'similarly situated'" to the named Plaintiffs examine the following considerations:  "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against collective action treatment.'"  *See Scott v. Chipotle Mexican Grill, Inc.*, No. 12-cv-8333, 2017 U.S. Dist. LEXIS 62902, at \*207-208 (S.D.N.Y. Mar. 29, 2017) (citing *Hernandez v. Fresh Diet, Inc.*, No. 12-cv-4339, 2014 U.S. Dist. LEXIS 139069, at \*8-9 (S.D.N.Y. Sept. 29, 2014)); *see also Jacob v. Duane Reade, Inc.*, No. 11 Civ. 0160, 2016 U.S. Dist. LEXIS 75384, at \*7 (S.D.N.Y. June 9, 2016); *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011) (decertifying FLSA claims of assistant store managers).  The relevant focus remains on whether the claims of the named Plaintiffs and the opt-in Plaintiffs can be adjudicated with common proof.  If the records show that the putative class members are not "similarly situated," the "conditional" aspect is removed, "the class is decertified, the claims of the opt-in plaintiffs are dismissed without prejudice, and the class representative may proceed on his or her own claims." *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 197 (S.D.N.Y. 2006) (citation omitted).

## POINT II

### THE NAMED PLAINTIFFS FORGED PATIENT SIGNATURES.
### THEY ARE SUBJECT TO UNIQUE DEFENSES

The named Plaintiffs are not adequate representatives because they are subject to unique defenses that do not apply to any opt-in Plaintiffs (except Kumagay).  *See Ruggles v. WellPoint, Inc.*, 591 F. Supp. 2d 150, 159-161 & n.10 (N.D.N.Y. 2008) (explaining that the court does not

make credibility determinations at the first stage but that it is appropriate during the second stage).

Plaintiffs Khansari, DeGeorge-Gearey and Daidone were all terminated effective May 15, 2015. They forged the signatures of behavioral health patients onto treatment plans. Kumagay engaged in the same behavior. She was terminated upon her return from a leave of absence. Such conduct undermines their credibility, and subjects them to defenses that do not apply to any of the other opt-in Plaintiffs. *Mota v. Imperial Parking Sys.*, No. 08-cv-9526, 2010 U.S. Dist. LEXIS 87593, at *39 n.24 (S.D.N.Y. Aug. 24, 2010) (finding that forgery undermined plaintiff's credibility); *Clauson v. Eslinger*, 455 F. Supp. 2d 256, 260 (S.D.N.Y. 2006) (same).

Credibility is directly at issue at this stage because Plaintiffs submitted declarations to the Court at the first stage asserting (among other things) that they were directed to work overtime hours off-the-clock and that, based on discussions with other Clinicians and Supervisors, others did as well. Plaintiffs' forgery diminishes their ability to credibly testify about the instructions they purportedly received and the assertions in their declarations. This Court granted summary judgment to Defendant on Plaintiffs' forgeries. [DE 102, pp. 27-35, 69-72.]

In this case Defendant will assert these individualized defenses against the named Plaintiffs. As such, they are not suitable to represent anyone else. Courts have decertified collective actions finding that plaintiffs' questionable credibility renders collective treatment unmanageable. *See, e.g., Soderberg v. Naturescape, Inc.*, Civ. No. 10-3429, 2011 U.S. Dist. LEXIS 156235, at *30 (D. Minn. Nov. 3, 2011).

## POINT III

## THE OPT-IN PLAINTIFFS' DEPOSITION TESTIMONY DEMONSTRATES THAT THEY ARE NOT SIMILARLY SITUATED TO THE NAMED PLAINTIFFS

### A.    The Disparate Circumstances of Each Plaintiff's Employment Circumstances Warrant Decertification

A collective action based on a *de facto* policy of requiring employees to work off-the-clock should be decertified unless the plaintiff demonstrates that the alleged *de facto* policy is "sufficiently uniform and pervasive as to warrant class treatment." *Zivali*, 784 F. Supp. 2d at 463 (citation omitted); *see also Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 299-300 (S.D.N.Y. 2015) (decertifying a FLSA class because plaintiffs failed to show "a common policy that operated to common effect"), *aff'd*, 687 F. App'x 39 (2d Cir. 2017); *Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22, 55 (W.D.N.Y. 2014) (decertifying collective action because plaintiffs "have not identified any system-wide policy or practice that was applied uniformly to each of the four named Plaintiffs. . . ."); *Seward v. IBM Corp.*, No. 08-cv-03976, 2012 U.S. Dist. LEXIS 38523, at *4-5 (S.D.N.Y. Mar. 9, 2012) (decertifying off-the-clock collective action where plaintiff failed to establish "the existence of a sufficiently uniform and pervasive policy requiring off-the-clock work . . .") (internal quotation marks omitted).  Where the "evidence points to an extremely wide range of company practices in the context of varied factual and employment settings," *Zivali*, 784 F. Supp. 2d at 464, decertification is necessary (citation omitted).

As the named Plaintiffs acknowledged in their SAC, the Hospital's lawful policy discouraged overtime and required that any overtime be approved in advance.  Certification with respect to Plaintiffs' off-the-clock claim was premised on the existence of an alleged *de facto* policy whereby the Clinicians' supervisors would deny Clinicians' requests for overtime and instruct them to work off-the-clock.  But Plaintiffs' off-the-clock claims involve individualized, supervisor-driven situations and do not warrant a conclusion that Defendant has a uniform *de*

*facto* policy requiring off-the-clock work. *See Zivali*, 784 F. Supp. 2d at 464-65.  Indeed, the

opt-in Plaintiffs' testimony shows that they cannot demonstrate that their alleged off-the-clock

work was attributable to a policy applicable to *all* Plaintiffs. *See Thind*, 2016 U.S. Dist. LEXIS

170503 at *7-8 (granting decertification where "the individual opt-in plaintiffs have disparate

factual and employment circumstances.... While Thind testified that he was expressly told to

work off the clock, a majority of the opt-in plaintiffs indicated that they were never explicitly

directed to do so. Given the factual differences among the opt-in plaintiffs, Thind cannot

demonstrate that Healthfirst employed a single, uniform policy of explicitly directing Facilitated

Enrollers to work off the clock in violation of its clear written policy."). In fact, while the named

Plaintiffs contend in the SAC that the supervisors directed them to work off-the-clock, not a

single opt-in Plaintiff testified that they were told to work off the clock, except one: Clinician

Larry Stone who worked with the named Plaintiffs in the Adult Outpatient Clinic.  For example:

- Amy Lyburn, who worked in the Community Recovery Services clinic, testified that her supervisors said that the Clinicians "should be able to get the work done," but never said that it had to be off-the-clock or directed her to work off-the-clock.  (Ex. G (Lyburn Dep.) 69:9-70:6.)

- April Rodriguez, who worked in both the Adult Outpatient Clinic and the David Casella Children's Services clinic, admitted that she was told at the commencement of her employment that all overtime had to be approved, and that if she did not obtain approval overtime was not authorized.  (Ex. H (Rodriguez Dep.) 80:16-82:16.)  She testified further that she was told she had to get her work done, but admits she never was told to work after clocking out or before clocking in.  (Ex. H 109:2-112:6.)

- Jeanette Santacruz, who worked in the David Casella Children's Services clinic, testified that she was allowed to clock-in when she arrived in the morning, was never told she had to clock-out and continue working in the evening, and was never specifically told to work overtime in excess of her scheduled hours.  (Ex. I (Santacruz Dep.) 85:22-87:3.)

- Julisa Checo, who worked in the Latin American Immigrant Services clinic until 2014 and then the Centralized Intake Services clinic, testified that she was never told by her supervisor to work overtime, and that her supervisor

13

never told her to work after clocking out or before clocking in. (Ex. J (Checo Dep.) 118:23-119:23.)

- Sylvia Dolman, who worked in the David Casella Children's Services clinic, testified that no one instructed her to clock out and then go back to work or to work through her lunch hour. (Ex. K (Dolman Dep.) 88:10-89:4.)

- Carmen Morales, who worked in the Continuing Care Unit, testified that she was never instructed to work before clocking in or after clocking out or to work during her lunch break. (Ex. L (Morales Dep.) 175:11-23.)

- Joseph Leeds, who worked in the Continuing Care Unit, was not told or directed to work before clocking in or after clocking out. (Ex. M (Leeds Dep.) 84:3-85:9.).

- Judy Grant, who worked in the Psychiatric In-Patient division of the Social Work Department as a Social Worker, testified that she was told to get her work done but admits that she was not told to do so off-the-clock. (Ex. N (Grant Dep.) 58:2-61:7, 110:22-111:20, 118:3-7.)

- Venus Casiano, who worked in the Community Care Clinic, testified that none of her supervisors ever told her to work before or after clocking in or clocking out. (Ex. O (Casiano Dep.) 134:14-20.)

- When asked if she had a similar experience to what was alleged in the Second Amended Complaint, *i.e.,* "'[d]espite being denied overtime approval, the named plaintiffs and the putative class are expected and in fact have been told by her supervisors to work overtime in excess of their regular workweek but not to clock in and record their hours such that they would be compensated for working overtime,'" Kathleen Naab, who worked in the David Casella's Children's Services clinic, testified that she did not have that experience. (Ex. P (Naab Dep.) 139:11-19, 140:5-8.)

*See also* Ex. D 122:13-24 (Kumagay was never told to clock out and go back to work, nor was she ever told to start working before she clocked in); Ex. Q (Marian Steele-Murray Dep.) 126:2-22 (same); Ex. R (Michael Gonzalez Dep.) 147:23-149:2 (same); Ex. S. (Tammy Holland Dep.) 91:7-18 (stayed to get her work done because no one told her, like now, she had to get out of the building) and 125:10-14 (no supervisor ever told her to work overtime in excess of her workweek but not clock in); Ex. T (Nyaling Camara Dep.) 68:14-17 (no supervisor ever told Camara that she had to work overtime in excess of her scheduled hours).

14

Further, many of the opt-in Plaintiffs testified in direct contradiction to the named Plaintiffs' contention that they were denied overtime; indeed, most opt-in Plaintiffs testified that they *never* were denied a request for overtime because they never asked for overtime approval. (Ex. F 141:4-10 (Stone could not recall asking and being denied overtime); Ex. G 104:14-105:21 (Lyburn could not recall a specific instance where she asked for overtime and the request was denied); Ex. H 108:21-109:10 (Rodriguez was unable to recall a specific time where she asked for overtime); Ex. J 117:18-118:13 (Checo admitted that she never asked her supervisor for overtime approval); Ex. N 74:12-75:3 (Grant admitted that she never specifically asked for overtime and had her overtime request denied by a supervisor); Ex. P 134:14-22 (Naab admitted that she never requested overtime). And those who did request overtime were told the circumstances under which it would be granted. (*See, e.g.*, Ex. I 76:24-77:17 (overtime was permitted provided, among other things, a clinician was meeting his or her levels of service for a certain period of time).)

Finally, some opt-in plaintiffs testified that even if they had been working off-the-clock (for whatever reason) for a portion of their employment, they were instructed to stop doing so in 2015 or 2016. (*See, e.g.*, Ex. G 51:24-54:17 (Lyburn testified that she was part of a meeting and a conversation with her supervisor in 2016 where she was told that Clinicians must only work during their scheduled shift); Ex. N 63:10-64:16 (Grant testified that she was told by her supervisors that she could not stay and work without prior authorization); Ex. Q 67:10-71:25, 131:6-17 (Steele-Murray testified that after this lawsuit started she was instructed she could not be in the building before or after her scheduled times and admitted that she was written up for coming in early around 2016); Ex. S 97:21-25, 99:20-100:11 (Holland testified that she was told in 2015 or 2016 that she had to "get out of the building" and to stop working any unapproved

overtime).)  Other opt-in plaintiffs have denied receiving such instructions at any point.  Such inconsistences in opt-in testimony warrant decertification.  *See Zivali*, 784 F. Supp. 2d at 465; *Lynch*, 2017 U.S. Dist. LEXIS 178855, at *8 ("Differing factual circumstances, particularly with regard to differences in supervisory authority, can provide justification for decertification.") (citation omitted).

The opt-in Plaintiffs' testimony belies any contention that there was a common policy such that "all Clinicians" were denied overtime approval and then directed to work off the clock.  In their declarations the named Plaintiffs described their own experiences unique to themselves; they cannot speak to the circumstances of *each and every* Clinician, as the experience of each Clinician varies widely.[11]  Such testimony renders specious Plaintiffs' allegation that there was a uniform *de facto* policy and makes decertification appropriate.  *Lynch*, 2017 U.S. Dist. LEXIS 178855, at *13 (decertification of collective for which 30 plaintiffs opted in was appropriate where "Plaintiffs' depositions further indicate critical differences in what supervisors told their employees about overtime...").

### B.  The Opt-in Plaintiffs' Differences Show That Defendant Has Individualized Defenses With Respect to Each Plaintiff and Claim

The significant factual differences with respect to each Plaintiff's diverse experiences under the Hospital's policies with respect to overtime lend themselves to individualized defenses by the Hospital, and favor decertification.  *See Thind*, 2016 U.S. Dist. LEXIS 170503, at *8; *see also Zivali*, 784 F. Supp. 2d at 467-68 (in absence of company-wide policy, defenses would be "highly individual" to each plaintiff); *Lynch*, 2017 U.S. Dist. LEXIS 178855, at *13-14 ("[T]he City's defenses will likely be highly individualized.  The City's knowledge of the alleged

---

[11] Barsa even admitted during her deposition that her sworn declaration applies only to those individuals that she supervised *in the AOC*.  (Ex. E 179:7-20.)

uncompensated time could vary from plaintiff to plaintiff, supervisor to supervisor, and unit to unit."); *Seward*, 2012 U.S. Dist. LEXIS 38523, at *5 (decertification warranted because "potential defenses were highly fact specific and w[ould] likely depend on the testimony of individual plaintiffs and managers"). These defenses include, but are not limited to whether Defendant had actual or constructive knowledge of the off-duty work performed; whether the work performed off-the-clock was *de minimis* or the opt-in Plaintiff is unable to substantiate his or her off-the-clock claims; and whether his or her claim (or any portion thereof) is barred by the applicable statute of limitations. *See, e.g., Zivali*, 784 F. Supp. 2d at 468 ("Without multiplying examples, it is clear that [defendant's] potential defenses in this case will be highly fact specific.")[12] Based on these defenses there is nothing "collective" about this case. Every single Plaintiff will be required to testify to establish both liability and damages on their claims. And Defendant will have specific defenses to each Plaintiffs' claims.

> ### (1)   Whether Defendant Had Actual or Constructive Knowledge of the Off-duty Work Performed.

Related to the highly individualized factual inquiry of whether each Plaintiff was instructed to work overtime is the inquiry into whether each opt-in Plaintiffs' supervisors had actual or constructive knowledge that he or she was working off-the-clock, which knowledge is required in order to establish liability under the FLSA for unpaid overtime. *Gordon v. Kaleida Health*, 299 F.R.D. 380, 392 (W.D.N.Y. 2014); *see also Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 287 (2d Cir. 2008).

---

[12] In addition, whether, when and under what circumstances each Opt-in Plaintiff was actually directed to work off-the-clock (or not directed to work off the clock) are individualized defenses that are also available to the Hospital. *See* Section II.A, *supra*. The Hospital has already filed a letter seeking a pre-motion conference so that it can file a summary judgment dismissing the opt-in Plaintiffs' claims that discovery revealed are deficient.

The element of employer knowledge of off-the-clock work itself has a number of subsidiary elements, including (a) whether any supervisor asked the employee to work any of the allegedly unpaid overtime hours (*Joza v. WW JFK LLC*, No. 07-cv-04153, 2010 U.S. Dist. LEXIS 94419, at *10 (E.D.N.Y. Sept. 9, 2010)); (b) whether any supervisor instructed or encouraged the employee to falsely report the time (*Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972); *Joza*, 2010 U.S. Dist. LEXIS 94419, at *5); (c) whether the employee complained about the off-the-clock work (*Joza*, 2010 U.S. Dist. LEXIS 94419, at *11; *Newton v. City of Henderson*, 47 F.3d 746, 749 (5th Cir. 1995); and (d) whether the employee took steps to prevent the defendant from learning about the overtime (*Joza*, 2010 U.S. Dist. LEXIS 94419, at *11-12; *Newton*, 47 F.3d at 749); *see also, e.g., Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1323 (11th Cir. 2007) (affirming summary judgment against plaintiff where "no one told her to work off the clock and she did not inform anyone of her overtime work," and she could not identify how her employer should have known that she was working without compensation); *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) ("[T]he FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about."). Discovery has revealed that there are factual differences between the named Plaintiffs and opt-in Plaintiffs that are material to these elements, requiring an individualized inquiry as to each of these elements for each opt-in.

For example, during her November 10, 2017 deposition, Carol Chaparro testified that no one from the Hospital knew that she was working other than during her regularly scheduled shift. (Ex. U (Chaparro Dep.) 90:9-14.) Chaparro further explained that her situation is "a lot different" from other clinicians in that no supervisors or directors were at the site where she worked (the Ambulatory Mental Health Clinic, known as Brief Care), so no one from the

Hospital observed her working off the clock. (Ex. U 89:7-90:14.) Further, no supervisor could have known she was working off the clock, because Chaparro intentionally tried to conceal her off-the-clock work. She testified that she understood that she was subject to disciplinary action if she worked prior to clocking in and after clocking out; because she was aware that the Hospital's electronic medical records system electronically tracked her time entries, she intentionally "would try to refrain from working in EMR" out of fear that her supervisor would notice her off-the-clock work, subjecting her to disciplinary action. (Ex. U 62:14-63:11, 65:20-66:4.) April Rodriguez likewise testified that she was never told that she had to work before clocking in or after clocking out and, like Chaparro, further testified that the Hospital's management would not have been aware that she was working outside of her clock in and clock out times. (Ex. H 95:9-14, 111:21-112:6, 113:2-115:8.) Similarly, Venus Casiano admitted that her supervisors did not have any specific knowledge that she was working outside of her scheduled working hours. (Ex. O 133:7-134:18.)

Several opt-in Plaintiffs testified that they never told their supervisor that they had worked any time without proper compensation, or complained about it. *See, e.g.*, Ex. H 120:3-14 (Rodriguez admitted she never complained to a supervisor or to human resources about not being paid overtime); Ex. L 175:24-176:16 (Morales testified that she never complained); Ex. N 118:17-24 (Grant testified she never complained); Ex. O 99:24-100:13 (Casiano testified that she never complained); Ex. S 131:21-132:17 (Holland testified that she never complained or informed anyone that she was working off the clock); *see also Joza*, 2010 U.S. Dist. LEXIS 94419, at *3 (no FLSA liability where plaintiff "never reported, formally or informally," the overtime hours claimed); *Newton*, 47 F.3d at 749 (same).

Other opt-in Plaintiffs testified that their supervisors purportedly knew of their off-the-clock work because they could see them in their office or saw them inside the clinic. *See, e.g.,* Ex. G 117:5-23 (Lyburn testified that her supervisors would "see us there"); Ex. N 113:3-114:24 (Grant testified that her supervisors saw her in the chart room with paperwork and therefore were aware she was working off the clock); Ex. O 95:4-96:17 (Casiano testified that her supervisors would have to come into her office to see her working overtime); Ex. S 128:13-130:19 (Holland testified that her supervisors could "see me there" at her desk at "clock-out time"). But this is the type of evidence that has been found to be insufficient to put an employer on notice of uncompensated overtime worked. *Hinterberger,* 299 F.R.D. at 37 ("'The relevant knowledge is not 'I know the employee was working,' but 'I know the employee was working and not reporting his time.'") (quoting *White v. Baptist Mem'l Health Care Corp.,* 699 F.3d 869, 875 (6th Cir. 2012)); *Joza,* 2010 U.S. Dist. LEXIS 94419, at *33 (rejecting argument that employer was on notice of unpaid overtime because "managers periodically passed by her cubicle and should have noticed that she was there during the usual lunch period and outside of her assigned shift hours.").

### (2)    Whether the Off-the-Clock Work Was De Minimis or the Opt-in-Plaintiff Cannot Substantiate Their Claims

"Work that is in theory covered by the FLSA may not be compensable when it is '*de minimis*,' that is, when it involves 'only a few seconds or minutes of work beyond the scheduled working hours.'" *Albrecht v. Wackenhut Corp.,* No. 07-cv-06162, 2009 U.S. Dist. LEXIS 88073, at *27 (W.D.N.Y. Sept. 24, 2009) (quoting *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 692 (1946)), *aff'd,* 379 F. App'x 65 (2d Cir. 2010). Further, where, as here, an employee disputes that the employer maintains proper and accurate time records, the plaintiff must introduce credible evidence to substantiate that she performed the overtime work alleged.

*Daniels v. 1710 Realty LLC*, No. 10-cv-00022, 2011 U.S. Dist. LEXIS 91902, at*16-17 (E.D.N.Y. Aug. 17, 2011), *aff'd*, 497 F. App'x 137 (2d Cir. 2012).   Where the employee is unable to do so, the employee's FLSA claim cannot stand.   *See, e.g., Paul v. Lenox Hill Hosp.*, No. 13-cv-01566, 2016 U.S. Dist. LEXIS 16548, at*72 (E.D.N.Y. Jan. 15, 2016).   Thus, an employer has a valid defense to an FLSA claim where the employee only worked limited overtime and/or cannot substantiate their claims.

Opt-in plaintiff Ruth Duarte was deposed in a separate matter pending before this Court. She alleged in her complaint that she was required to work overtime, but was never compensated for it.   Her testimony shows that she worked during her lunch hour and sometimes after 5 p.m., but that she did not work in the mornings before clocking in or on weekends.   (Ex. V (Duarte Dep.) 19:19-20:6.)   She testified that she only worked during her lunch hour two or three times a week (although she could not recall when) (Ex. V 22:20-24:3), and that she only worked after the end of her shift at 5 p.m. *less than 5 times during her entire employment* of seven years for "maybe an hour," but likewise could not recall when this occurred.   Given that she worked a 35 hour weekly schedule there is virtually no scenario in which she can establish that she worked more than 40 hours in any workweek during the appropriate recovery period.

Dolman's claim also cannot stand.   She filed her opt-in form on October 18, 2016; because her employment terminated March 27, 2013, her only possible recovery is between March 1, 2013 and March 27, 2013.   Dolman testified that she did not work in excess of 40 hours during any week for which her Simplified Time Detail report reflects that she took a day off. (Ex. K 115:2-9; 117:20-118:9.)   That leaves only two weeks when Dolman could have worked overtime during this recovery period—the weeks starting March 4, 2013 and March 18, 2013. She initially testified that she worked "[a]pproximately" 43.5 hours every week during her

employment in 2012 and 2013. (Ex. K 47:23-48:6). She later conceded, however, that (1) she did not work 43.5 hours every week (Ex. K 108:5-11); (2) she took a full hour-long lunch break 60 percent of the time, during which she did not work (Ex. K 98:3-15); (3) she never worked before clocking in, did not work after clocking out every day, and cannot recall any specific date(s) in 2012 or 2013 when she did work after clocking out (Ex. K 66:11-15, 103:19-104:17); and (4) specifically testified that "I'm not going to be able to sit here and tell you what weeks I worked more than 40 hours. It's just not going to happen. . . . I don't remember specifically." (Ex. K 119:9-13). When asked if she could recall what percentage of the time she believes she worked over 40 hours in a week, she responded, "I mean, I really don't know." (Ex. K 119:14-22, 120:11-24). Because there is only a limited window (from March 1, 2013 through March 27, 2013) for which Dolman can recover and because Dolman was unable to identify a specific week in which she worked in excess of 40 hours and she candidly acknowledged that she could not identify such a week, her FLSA claim cannot stand.

Finally, for example, Defendant will argue that to the extent Kumagay remained in the office after clocking out, it was not to do work, but rather for personal reasons. (*See, e.g.,* Ex. D 86:2-89:20 and Ex. W (Kumagay Dep. Ex. 10 (Kumagay wrote that she stayed late in the office "many times" not to do work, but rather to attend to personal matters).)

### (3) Whether the Opt-in Plaintiff's Claim is Barred by the Applicable Statute of Limitations.

"The FLSA provides a two-year statute of limitations on actions to enforce its provisions, 'except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.'" *Parada v. Banco Indus. de Venez.*, 753 F.3d 62, 70 (2d Cir. 2014) (quoting 29 U.S.C. § 255(a)); *see also Diaz v. S&H Bondi's Dep't Store, Inc.*, No. 10-cv-7676, 2012 U.S. Dist. LEXIS 5683, at *25 n.7 (S.D.N.Y. Jan. 17, 2012) (Gardephe, J.)

(quoting 29 U.S.C. § 255(a)).  Assuming a willful violation, which Defendant disputes applies, but for purposes of this motion will use, the limitations window is three years in light of Plaintiffs' allegation that Defendant's violation of the FLSA was willful.  [DE 18, ¶ 160.] Further, the Court equitably tolled that limitations window by 231 days in its May 12, 2016 Order granting Plaintiffs' motion for conditional collective action certification[13] [DE 60, p. 12]. Accordingly, the applicable statute of limitations window in this action is three years and 231 days.

Under the FLSA, the statute of limitations is "governed by [the] date that consent forms [are] filed."  *Rodriguez v. Obam Mgmt.*, No. 13-cv-00463 (PGG) (DF), 2016 U.S. Dist. LEXIS 155315, at *14 (S.D.N.Y. Nov. 7, 2016) (Freeman, J.) (amended report and recommendation) (citing *Charvac v. M & T Project Managers of N.Y., Inc.*, No. 12-cv-05637, 2015 U.S. Dist. LEXIS 124906, at *9-10 (E.D.N.Y. June 17, 2015)); *see also Diaz*, 2012 U.S. Dist. LEXIS 5683, at *25 n.7 ("'the statute of limitations runs for each individual plaintiff until he consents to join the action'") (citation omitted); *Melgadejo v. S&D Fruits & Vegetables Inc.*, No. 12-cv-6852, 2013 U.S. Dist. LEXIS 159932, at *7 (S.D.N.Y. Nov. 7, 2013) (Pitman, J.) ("'Under the FLSA, potential class members in a collective action must affirmatively opt-in to be covered by the suit. The statute of limitations continues to run on a potential class member's claim until she files written consent with the Court.'") (quoting *Malena v. Victoria's Secret Direct, LLC*, No. 09-cv-5849, 2010 U.S. Dist. LEXIS 121320, at *8 (S.D.N.Y. Nov. 16, 2010) (citing 29 U.S.C. §§ 216(b), 256(b)); *Lee*, 236 F.R.D. at 199 ("'[T]he statute of limitations period continues to run

---

[13] The Court stated that "[g]iven the length of time that the motion has been pending, the Court finds that equitable tolling is appropriate as of the date the motion was filed. . . ." [DE 60, p. 12.] Because Plaintiff moved to certify the class on September 25, 2015 [DEs 27, 28] and the Court ruled on the motion on May 12, 2016 [DE 60], the limitations period was equitably tolled by 231 days.

with respect to each potential plaintiff's collective action claim until the plaintiff files the written consent form.") (citation omitted). Thus, for an opt-in Plaintiff, the statute continues to run until he or she files an "opt-in" form with the Court and, once filed, an opt-in Plaintiff's consent will not relate back to the filing date of the original complaint. *See D'Arpa v. Runway Towing Corp.*, No. 12-cv-1120, 2013 U.S. Dist. LEXIS 85697, at *18-20 (E.D.N.Y. June 18, 2013).

Opt-in Plaintiffs whose employment ended prior to the applicable date, including Adela Inez and Janice Mays, are time-barred and not able to sustain viable FLSA claims.[14]

### C.   Fairness and Procedural Considerations Counsel Against Collective-Action Treatment

Adjudicating the Opt-in Plaintiffs' FLSA claims as a collective action would be inefficient and manifestly unfair to Defendant, especially since the named Plaintiffs are forgers who were properly terminated for their misconduct. As reflected above, there are few common issues of fact relevant to Plaintiffs' allegations, and resolution of these fact-specific issues would require a trial as to each opt-in Plaintiff to evaluate each person's claims. "'Such a result is the antithesis of collective action treatment and would . . . eliminate any judicial efficiency that might be gained through a collective approach.'" *Zivali*, 784 F. Supp. 2d at 469 (quoting *Hinojos v. Home Depot, Inc.*, No. 06-cv-00108, 2006 U.S. Dist. LEXIS 95434, at *8 (D. Nev. Dec. 1, 2006)). Indeed "given the factual distinctions between plaintiffs (or at least groups of plaintiffs), the procedural benefits are few—indeed, each plaintiff would need to present evidence about their failure to receive overtime compensation, subject to cross-examination and individual challenges by the defendant." *Lynch*, 2017 U.S. Dist. LEXIS 178855, at *14. For this reason, "upon more 'stringent' examination, the plaintiffs [cannot meet] their burden to show that the

---

[14] Plaintiffs' counsel has acknowledged that the claims of Inez and Mays are untimely and has stated that they will withdraw their claims; yet they have not done so [DE 137, p.5 n.2].

class members are similarly situated for the purposes of § 216(b) certification," and the collective class should be decertified. *Id.* at *15 (decertifying collective consisting of 30 opt-in plaintiffs).

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that Plaintiffs' FLSA conditionally certified collective action be decertified and the opt-in Plaintiffs' claims be dismissed without prejudice and that the Court Order such other and further relief as the Court deems just and proper.

New York, New York
December 11, 2017

EPSTEIN BECKER & GREEN, P.C.

By:  */s Kenneth W. DiGia*
     Kenneth W. DiGia
     250 Park Avenue
     New York, NY  10177
     Telephone:  (212) 351-4610
     E-mail:  kdigia@ebglaw.com
     *Attorneys for Defendant*
     *St. Barnabas Hospital*